UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**WEST-LINN WILSONVILLE SCHOOL
DISTRICT**,

                Plaintiff,                            Case No. 3:12-CV-02364-ST

      v.                                 **OPINION AND ORDER**

**STUDENT**,

                Defendant.

**STEWART, Magistrate Judge:**

## INTRODUCTION

This case concerns whether the West-Linn Wilsonville School District ("the District")
provided Student a free appropriate public education ("FAPE") as required by the Individuals
with Disabilities Education Act, 20 USC §§ 1400-1487 ("IDEA"), and its Oregon counterpart,
ORS 343.146-.193, while Student attended second and third grades at Boones Ferry Primary
School ("Boones Ferry") from 2009 to 2011.  On October 4, 2012, after a 10-day hearing held in
February and continued to March and August with numerous witnesses, Senior Administrative
Law Judge Ken L. Betterton ("ALJ") issued a Final Order that the District had provided Student
a FAPE during the 2009-10 school year, but denied him a FAPE during the 2010-11 school year.
*In the Matter of the Educ. of Student and West Linn-Wilsonville Sch. Dist.*, OAH Case No. DP

11-122 ("Final Order").  Both parties appeal those portions of the ALJ's decision adverse to

them.  For the following reasons, the Final Order is reversed as to the remedy of tuition

reimbursement and otherwise affirmed.

## STANDARDS

### I.    Statutory Framework

In 1990, Congress passed the IDEA which provides federal grants to state and local

agencies to improve educational opportunities for disabled children.  *Mark H. v. Lemahieu*, 513

F3d 922, 928-29 (9th Cir 2008).  To receive those federal funds, states must comply with the

various provisions of the IDEA and its implementing regulations to identify, evaluate, and serve

the unique needs of each disabled student.  20 USC §§ 1412, 1414, 1416; 34 CFR § 300 *et seq*.

The IDEA's central purpose is "to ensure that all children with disabilities have available

to them a free appropriate public education that emphasizes special education and related

services designed to meet their unique needs and prepare them for further education,

employment, and independent living."  20 USC § 1400(d)(1)(A).  A "free appropriate public

education" is "special education and related services" that –

> (A) have been provided at public expense, under public
> supervision and direction, and without charge;
>
> (B) meet the standards of the State educational agency;
>
> (C) include an appropriate preschool, elementary school, or
> secondary school education in the State involved; and
>
> (D) are provided in conformity with the individualized education
> program required under section 1414(d) of this title.

20 USC § 1401(9).

Oregon has implemented the substantive and procedural requirements of the IDEA by

statute and through regulations issued by the Oregon Department of Education ("ODE").  *See*

ORS 343.146-.193; OAR 581-015-2000 *et seq.* State standards that are not inconsistent with federal standards are enforceable in federal court. *W.G. v. Bd. of Trustees of Target Range Sch. Dist. No. 23, Missoula, Mont.* ("*Target Range"*), 960 F2d 1479, 1483 (9th Cir 1992) (citations omitted), *superseded by statute on other grounds by* 20 USC § 1414(d)(1)(B).

Central to the IDEA is the "individualized education program" ("IEP"), a comprehensive written plan developed by an "IEP team" consisting of the student's parents, teachers, and representatives of the local educational agency ("LEA") or school district where the child is receiving educational services. 20 USC § 1414(d). To comply with the IDEA, the IEP must describe the child's present performance levels, the educator's short and long term goals, the specific educational services to be provided, how much the child can participate in regular educational programs, and objective criteria for measuring the child's progress. 20 USC § 1414(d)(1)(A)(i). The IEP's ultimate purpose is to tailor the educational services the LEA provides to meet the special needs created by the student's disability and ensure that the student receives the benefit of a FAPE. 20 USC §§ 1412(a)(4) & 1414(d).

Parental involvement is a fundamental component of the operation of the IDEA. Thus, the IDEA mandates that a state educational agency ("SEA") or LEA receiving assistance must establish and maintain a litany of procedural safeguards to ensure the parents' opportunity to be fully involved in the educational services provided to their child. 20 USC § 1415.

> The significance of the procedures provided by the IDEA goes beyond any measure of a child's academic progress during the period at issue. As the Court in *Rowley* said, "Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation" at every step "as it did upon the measurement of the resulting IEP."

*Target Range*, 960 F2d at 1485, citing *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley* ("*Rowley"*), 458 US 176, 205-06 (1982).

The parent or LEA may file a complaint with respect to any matter relating to the provision of a FAPE to a child with disabilities which may be heard before an impartial state hearings officer.  20 USC § 1415(b)(6)-(7), (f).  Any party aggrieved by the findings and decision made in a state administrative due process hearing may bring an original civil action in a state court of competent jurisdiction or in federal district court to review the findings and decision.  20 USC § 1415(i)(2)(A), (3)(A).

## II.    <u>Standard of Review</u>

The standard of review in IDEA actions "has been characterized as a modified *de novo* review."  *Ashland Sch. Dist. v. Parents of Student E.H.*, 583 F Supp2d 1220, 1222 (D Or 2008) (citation omitted), *aff'd* 587 F3d 1175 (9th Cir 2009).  A district court may "hear additional evidence" outside the administrative record and then, basing its decision "on the preponderance of the evidence," grant "such relief as the court determines is appropriate."  20 USC § 1415(i)(2)(C).

The preponderance of the evidence standard in the IDEA "is by no means an invitation to the court to substitute their own notions of sound educational policy for those of the school authorities which they review."  *Rowley*, 458 US at 206.  Because the state is thought to have "specialized knowledge and experience," the IDEA carries "the implied requirement that due weight shall be given to these proceedings."  *Id* at 206-08 (citation omitted); *see also Capistrano Unified Sch. Dist. v. Wartenberg ex rel. Wartenberg* ("*Capistrano*"), 59 F3d 884, 892 (9th Cir 1995) ("The district court's independent judgment is not controlled by the hearing officer's recommendations, but neither may it be made without due deference.").

The amount of deference given to the hearing officer's findings is a matter for the court's discretion, with greater deference given to findings that are "thorough and careful."  *Capistrano*,

59 F3d at 891 (citation omitted).  Ultimately, once the court has "consider[ed] the findings

carefully . . . the court is free to accept or reject the finding in part or in whole."  *Ash v. Lake*

*Oswego Sch. Dist.*, 980 F2d 585, 587-88 (9th Cir 1992) (citation omitted).

In reviewing the administrative decision, the court's inquiry is two-fold:

> First, has the State complied with the procedures set forth in the
> Act?  And second, is the individualized educational program
> developed through the Act's procedures reasonably calculated to
> enable the child to receive education benefits?  If these
> requirements are met, the state has complied with the obligations
> imposed by Congress and the courts can require no more.

*Rowley*, 458 US at 206-07.

Congress placed a great deal of importance on the procedural safeguards in the IDEA.

*R.B., ex rel. F.B. v. Napa Valley Unified Sch. Dist.* ("*Napa Valley*"), 496 F3d 932, 938 (9th Cir

2007).  However, not all procedural flaws deny the child a FAPE.  *Id* (citations omitted).  "A

child is denied a FAPE only when the procedural violation "result[s] in the loss of educational

opportunity or seriously infringe[s] the parents' opportunity to participate in the IEP formation

process."  *Id* (citation omitted), citing *Target Range*, 960 F2d at 1484; *see also* 20 USC

§ 1415(f)(3)(E)(ii),[1] 34 CFR § 300.513(a),[2] ORS 343.167(3).  Moreover, the Ninth Circuit has

concluded that "where the procedural inadequacies of an IEP may have resulted in the loss of an

educational opportunity, or deprived a child's parents of the opportunity to participate

---

[1] 20 USC § 1415(f)(3)(E)(ii) provides as follows:
(ii) In matters alleging a procedural violation, a hearing officer may find that a child did not receive a free appropriate public education only if the procedural inadequacies --
(I) impeded the child's right to a free appropriate public education;
(II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or
(III) caused a deprivation of educational benefits.

[2] 34 CFR § 300.513(a) provides in part as follows:
(2) In matters alleging a procedural violation, a hearing officer may find that a child did not receive a FAPE only if the procedural inadequacies--
(i) Impeded the child's right to a FAPE;
(ii) Significantly impeded the parent's opportunity to participate in the decision-making process regarding the provision of a FAPE to the parent's child; or
(iii) Caused a deprivation of educational benefit.

meaningfully in forming an IEP, an appellate court should not proceed to step two of the *Rowley* analysis, i.e., whether the IEP was reasonably calculated to enable the child to receive educational benefits." *M.L. v. Fed. Way Sch. Dist.* ("*Federal Way*"), 394 F3d 634, 645 (9th Cir 2005), citing *Target Range*, 960 F2d at 1485.  If "a procedural violation does not result in a lost educational opportunity for the student, the violation is 'harmless error' because it does not deny the student a FAPE." *Napa Valley*, 496 F3d at 938 n4 (citation omitted).  Thus, "rigid 'adherence to the laundry list of items given in section 1401(19)' is not paramount." *Target Range*, 960 F2d at 1484, quoting *Doe v. Defendant I*, 898 F2d 1186, 1190-91 (6th Cir 1990).

As explained by the United States Supreme Court, the "'basic floor of opportunity' provided by the [IDEA] consists of *access* to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child." *Rowley*, 458 US at 201 (emphasis added).  An IEP need not maximize a student's educational benefit.  *Id* at 199.  Further, the district is the final arbiter of the educational program.  As aptly noted by one court, "parents, no matter how well-motivated, do not have a right under the [IDEA] to compel a school district to provide a specific program or employ a specific methodology in providing for the education of their handicapped child." *Lachman v. Ill. State Bd. of Educ.*, 852 F2d 290, 297 (7th Cir 1988) (applying a predecessor statute to the IDEA, the Education for All Handicapped Children Act).

## <u>DISCUSSION</u>

After three stages of extensive briefing, both before and after the administrative hearing (Tr. 87-381, 400-14) [3] and supporting this appeal, the parties are well-versed in the facts of this case.  Therefore, the court will refer to the relevant facts only as necessary to resolve the issues presented.

---

[3] "Tr." refers to the Stipulated Administrative Record (docket #11) filed on October 11, 2013.

## I.    Student's Cross Appeal (Counterclaim)

For the 2009-10 school year, the ALJ issued the following conclusions of law adverse to

Student:

> (1)  The District did not fail to evaluate the Student in all areas of suspected disability during the 2009-2010 academic year.
> (2)  The District did not fail to provide the Student a FAPE during the 2009-2010 academic year.
> (3)  The District did not fail to provide an appropriate placement for the Student during the 2009-2010 academic year.

Tr. 73.

The 2009-10 school year involves the January 2009 and the December 2009 IEPs.

Although not expressly stated in his conclusions of law, the ALJ opined that the District did not

violate the IDEA until "a series of things occurred" beginning in "late February or early March

2011, and continuing to the end of the school year." Tr. 77.  Therefore, Student appeals not only

the three conclusions of law for the 2009-10 school year, but also those portions of the Final

Order adverse to him regarding the 2010-11 school year prior to the spring of 2011 which

involves the December 2010 IEP.

### A.    Legal Standards Applied by ALJ

As a threshold issue, Student contends that the ALJ applied the wrong legal standards.

First, Student argues that the ALJ misinterpreted the IDEA's "educational benefit" standard by

citing this court's statement that school districts "must, to 'make such access meaningful,' confer

at least 'some educational benefit' on disabled students." Tr. 74-75, citing *G.R. ex rel. v. Dallas

Sch. Dist. No. 2*, 823 F Supp2d 1120 (D Or 2011).  However, the ALJ correctly quoted this court

that, in turn, quoted the Ninth Circuit's interpretation in *J.L. v. Mercer Island Sch. Dist.*, 592 F3d

938, 951 n10 (9th Cir 2010), of the "educational benefit" standard set forth in *Rowley.  See G.R.*,

823 F Supp2d at 1130.  The Supreme Court's elucidation of the substantive underpinnings of a

FAPE in *Rowley* has withstood two amendments of the IDEA, and Student presents no compelling argument why its authority has diminished of late.  To be clear, the Court dedicated the majority of its opinion dispensing with the notion that the IDEA imposed "upon the States any greater substantive educational standard than would be necessary to make such access meaningful."  *Rowley*, 458 US at 192.  Instead,

> Congress expressly recognized that in many instances the process of providing special education and related services to handicapped children is not guaranteed to produce any particular outcome.  Thus, the intent of the Act was more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside.

*Id* (internal quotation omitted).

Student also mischaracterizes the ALJ's reliance on *K.E. ex rel. K.E. v. Indep. Sch. Dist. No. 15*, 647 F3d 795, 810 (8th Cir 2011), as erroneously adopting a standard under which a student's educational progress overshadows any violation of the IDEA.  The ALJ did not borrow any inappropriate standard from the Eighth Circuit, but cited *K.E.* for similar claims of substantive violations as alleged by the Parents in their Due Process Complaint.  Moreover, the Eighth Circuit in *K.E.* applied the same two-step inquiry mandated by *Rowley* and applied by the ALJ in this case.  *K.E.*, 647 F3d at 804.

Student also objects to the following characterization by the ALJ of the relationship between the IDEA procedural and substantive requirements:  "To the extent that the IEPs applicable to the 2009-10 school year were deficient procedurally in other areas, the Parents failed to prove that the Student did not receive at least some educational benefit during the school year."  Tr. 76.  Student asserts that this finding is contrary to the requirement that a court "first considers a school district's procedural compliance before reaching the IEP's substance." *Napa Valley*, 496 F3d at 938 (citation omitted).

Although procedural and substantive violations are distinct, they are interrelated.  Once a procedural violation of the IDEA is identified, the court "must determine whether that violation affected the substantive rights of the parent or child."  *L.M. v. Capistrano Unified Sch. Dist.*, 556 F3d 900, 909 (9th Cir 2009) (citations omitted).  Unless procedural violations "result in the loss of educational opportunity, or seriously infringe the parents' opportunity to participate in the IEP formulation process," then then they are harmless and do not result in the denial of a FAPE.  *Id*, citing *Target Range*, 960 F2d at 1484.

Student argues the ALJ should have followed the Ninth Circuit's decision in *Amanda J. ex rel. Annette J. v. Clark Cnty. Sch. Dist.* ("*Amanda J.*"), 267 F3d 877, 895 (9th Cir 2001), finding that the district's procedural violation denied the student a FAPE.  As the Eighth Circuit did in *K.E.* and the ALJ did here, the Ninth Circuit in *Amanda J.* considered the widely accepted circumstances under which a procedural violation denies a FAPE.  *Id* at 892.  The denial of a FAPE in *Amanda J.* resulted from the district withholding reports indicating the student's autism which seriously infringed on her parents' opportunity to participate in the formulation of her IEP.  *Id* at 893.  That result does not change the usual analysis of determining when a procedural violation impacts the student's rights.  Identifying a lost educational opportunity first requires determining whether the student suffered a substantive educational deficit.  By concluding that any remaining procedural violations were harmless because they did not seriously infringe the Parents' rights or deny Student an educational benefit, the ALJ did not err.

## B.    Preservation of Claims

As another threshold matter, the District argues that several of Student's claims are not properly before this court because they were not raised either in the Due Process Complaint or during the administrative hearing.  These claims are:  (1) the absence of a regular teacher from

the December 2010 IEP; (2) the exclusion of the Parents from drafting and revising the Behavior Protocol in February 2009; (3) the failure to include in the December 2010 IEP team a district representative with the authority to meet Student's needs; (4) Student's removal from the read-aloud in the regular education classroom after interrupting his teacher, Cynthia Krieg, during the 2010-11 year; (5) the exclusion of Student's Instructional Assistants ("IA") (Sue Like and Kami Switzer) from the drafting the December 2010 IEP; (6) the predetermination of Student's placement; (7) the unilateral change in Student's placement by frequently sending Student home early from school; and (8) deficiencies in the IEPs causing two students to bully Student.

"The party requesting the due process hearing shall not be allowed to raise issues at the due process hearing that were not raised in the notice filed under subsection (b)(7), unless the other party agrees otherwise."  20 USC § 1415(f)(3)(B).  The "notice filed under (b)(7)" is the Due Process Complaint.  *See* 20 USC § 1415(b)(7)(A); OAR 581-015-2360(2).

Neither the IDEA nor the Oregon statute explains the level of agreement necessary to include issues not raised by the Due Process Complaint.  Student contends that by failing to object to new issues raised at the hearing, the District consented to them.  The District responds that constructive consent does not concede jurisdiction over such claims and points to its lack of agreement before or during the 10 days of hearing to add more issues to Student's challenge.

Neither party cites cases addressing the issue of constructive consent in this context.  Student argues that the threshold for reviewing an issue not alleged in the Due Process Complaint is whether the District received notice of the issue during the hearing.  Some courts have adopted this approach.  *See e.g.*, *Coale v. State Dep't of Educ.*, 162 F Supp2d 316, 333 (D Del 2001) (finding that discussion of the allegedly unpreserved issue at the hearing put the state on notice that it was included in the parents' challenge and preserved the issue).  Others

have denied preservation of claims without an express agreement.  *See Snyder ex rel. Snyder v. Montgomery Cnty. Pub. Sch.*, CIV A DKC 2008-1757, 2009 WL 3246579, at *7 (D Md Sept. 29, 2009).  However, *Snyder* relied on First and Fourth Circuit decisions that refused to review issues not "raised to the hearing officer."  *See A.K. ex rel. J.K. v. Alexandria City Sch. Bd.*, 484 F3d 672, 679 n7 (4th Cir 2007); *David D. v. Dartmouth Sch. Comm.*, 775 F2d 411, 424 (1st Cir 1985).  Those two decisions did not interpret the statutory language as requiring an express agreement or searching for evidence of one in the record.  This court is more persuaded by the first approach and concludes that, even if not raised by the Due Process Complaint, Student has preserved any claim of error addressed at the hearing, such as through questioning of witnesses without any objection or showing of prejudice by the District.

Turning next to what claims are preserved, this court notes that, contrary to the District's contention, the Due Process Complaint does raise part of one of the contested claims, namely that the District failed to address the bullying incidents in its placement choice in 2010-11.  Tr. 467, ¶ 6(b).  Thus, that claim is preserved.

As discussed next, the remaining contested issues, with one exception, were raised at the hearing and, thus, were preserved.

Student argues that the claim regarding the absence of a regular education teacher on the December 2010 IEP team was raised by the Due Process Complaint for two reasons.[4]  First, he argues that the allegations regarding the absence of a regular teacher at the January 2009 IEP planning meeting apply equally to the December 2010 IEP meeting.  Second, he contends that the general allegation regarding the inadequacy of December 2010 IEP was sufficient notice of this claim.  This court disagrees.

---

[4] Student also argues that the District concedes it failed to ensure appropriate input from Ms. Krieg at the December 7, 2010 IEP meeting, but fails to provide any supporting reference to the Administrative Record.

The Due Process Complaint is lengthy and contains 188 allegations of substantive violations divided into a number of sections, including two separate sections regarding the January 2009 and December 2010 IEPs.  Section B(2) regarding the January 2009 IEP planning meeting specifically alleges that:

> (c)  No regular education teacher attended the January 8, 2009 IEP meeting.
> (d)  The January 2009 IEP cover sheet, where the regular education teacher's name should be written as a participant, reads, "not necessary due to [Student's] educational program." * * *
> (f)  The parents were not asked, and did not sign, permission for the regular education teacher to be excused from the January 8, 2009 IEP meeting.

Tr. 453.

Those specific allegations are not found in the subsequent section addressing the December 2010 IEP.  Despite this omission, Student points to the following allegation regarding the December 2010 IEP to suggest a similar procedural violation:  "The Present Levels on the 2010 IEP do not address how the Student's disability affects involvement and progress in the regular education curriculum."  Tr. 463, ¶ B(5)(i).  This same allegation appears in the December 2009 IEP section of the Due Process Complaint (Tr. 457, ¶ B(2)(ccc)), yet the Parents never argued that the December 2009 IEP was inadequate for this reason.  Given the exhaustive nature of the Due Process Complaint, the allegations regarding the December 2010 IEP are insufficient to place the District on notice that it lacked input from a regular education teacher.

Although not sufficiently alleged in the Due Process Complaint, Student did raise this issue at the hearing while questioning John Page, Student's special education teacher.  Page Test., Tr. 51-52 (Feb. 27).  Moreover, the ALJ addressed this issue by concluding that the absence of Ms. Krieg from the December 2010 IEP team contributed to the denial of a FAPE. Tr. 77.  Therefore, Student has preserved this claim of error.

With respect to the issue of writing Student's Behavior Protocol in February 2009 without input from the Parents, Student's attorney specifically asked the Mother whether she was involved in writing or revising it.  Mother Test., Tr. 296-98 (Aug. 14).  This was sufficient to place the District on notice of the Mother's exclusion.

With respect to the issue of not attending the read-aloud in the Ms. Krieg's classroom after misbehaving, the District's attorney questioned Ms. Krieg on that issue.  After a general line of questioning about Student's misbehavior increasing throughout the second half of the 2010-11 school year, he asked specifically:

> **Q.**  **And after that incident, a decision was made to not have him come to your class?**
> A.  Yeah, yeah.
> **Q.**  **Did – did you request that he not be brought to your class?**
> A.  No, no.
> **Q.**  **Okay.  Do you know who made that decision?**
> A.  Mr. Page made that decision.

Krieg Test., Tr. 200 (Feb. 27).

On cross-examination, Student's attorney asked Ms. Krieg to refer to Mr. Page's email acknowledging that Student would not be joining the regular education class.  *See* Krieg Test., Tr. 209-10 (Feb. 27).  The email stated: "This is obviously unacceptable and we will not send [Student] tomorrow or next week."  Student Ex. 37.  This questioning placed the District on notice of this issue.

With respect to the exclusion of Ms. Like and Ms. Switzer (the IAs at Boones Ferry) from the drafting of the 2010 IEP, Student's attorney discussed this issue with both Ms. Like and Mr. Switzer at the hearing.  Like Test., Tr. 126-28 (Feb. 28); Switzer Test., Tr. 239-41 (Feb. 28).

The Due Process Complaint raises the issue regarding the District predetermining Student's placement, but only for the 2009-10 school year.  Tr. 461, ¶ 3b ("The District

predetermined the Student's placement on the January 2009 IEP as evidenced by the absence of

a regular education teacher at the January 8, 2009 IEP meeting.").  The allegations in the Due

Process Complaint for the 2010-11 school year do not include the specific predetermination

argument.  Tr. 457.  However, at the hearing, the District questioned the Mother about the fact

that the 2010-11 placement was prepared prior to the December 10, 2009 IEP planning meeting.

Mother Test., Tr. 26-31 (Aug. 15).  Thus, Student has preserved the issue of the District

predetermining his placement for both the 2009-10 and 2010-11 school years.

With respect to frequently sending Student home early, witnesses were questioned at the

hearing numerous times about the frequency or nature of the Parents picking Student up early

from school due to misbehavior.

Only one issue was not properly preserved, namely the District's alleged failure to

include in the 2010 IEP team a district representative with the authority to meet Student's needs.

Student's citation to the Administrative Record (Tr. 10-11 (Feb. 24)) is inaccurate, and the court

cannot find where this issue was otherwise raised during the testimony.  Therefore, the court will

not consider this claim of error.

### C.    Evaluation of All Suspected Areas of Disability

Student argues that by overlooking the District's failure to conduct a reevaluation of his

behavioral needs, the ALJ erred in concluding that the IEPs evaluated Student in all areas of

suspected disability.  The IDEA requires reevaluations "if the local educational agency

determines that the educational or related service needs, including improved academic

achievement and functional performance, of the child warrant a reevaluation" or "if the child's

parents or teacher requests a reevaluation."  20 USC § 1414(a)(2)(A).  Oregon law requires that

reevaluation to be completed within 60 school days "from written parent consent (or from the

date the evaluation is initiated under OAR 581-015-2095(3)(c)) to the date of the meeting to consider eligibility, continuing eligibility or the student's educational needs."  OAR 581-015-2110(5)(b).

With respect to the 2009-10 school year, the ALJ relied on testimony from Mr. Page, Jennifer Patterson (principal at Boones Ferry) and Ms. Switzer that Student's behavior improved. Tr. 75.  Ms. Switzer came to Boones Ferry with Student after instructing him at Stafford Elementary School ("Stafford") and continued as his IA through the 2009-10 school year. Switzer Test., Tr. 245, 257 (Feb. 28).  From January to June 2009, Ms. Switzer and Mr. Page observed Student become more social.  *Id* at 251; Page Test., Tr. 417 (Feb. 24).  During the 2009-10 school, as Student gradually spent more time in the general education setting, Ms. Switzer observed that the incidents when Student was aggressive or threatening were isolated.  Switzer Test., Tr. 257 (Feb. 28).  Generally, "things had gotten much better for him behaviorally," and he was well-behaved for the majority of the time.  Page Test., Tr. 258, 416 (Feb. 24).  Mr. Page also testified that his staff was able to reduce Student's frustration and threatening behaviors by June 2010.  *Id* at 427 ("The Student has dramatically decreased the amount of threatening behavior throughout the course of the year.").

Student now argues that his misbehavior was pervasive during this period, signaling the District's duty to reevaluate the behavior strategies posed in the January 2009 IEP.  He cites a series of isolated outbursts occurring on picture day (September 2009), at a student assembly (December 2009), during PE class (January 2010), during recess (December 2010), and in his Applied Academics ("AA") classroom (January 2010).  Citing *Scappoose Lake Oswego Pub. Sch Dist. 7J*, 109 LRP 31536, Case No. 07-954-021, 12 (SEA Or 2007), Student argues that each event triggered the reevaluation requirement.

*Scappoose*, however, is distinguishable.  In that case, the parents specifically requested that the district evaluate the student for occupational therapy services and assistive technology services.  Because the district completed both evaluations within 60 school days, the court found that it had complied with the reevaluation procedures.  In contrast here, Student cites no evidence that the Parents made any request for a reevaluation.

Moreover, Student's misbehavior alone did not warrant a reevaluation.  The Behavior Protocol, which was written by the IEP team on the same day as the January 2009 IEP meeting and revised on February 3, 2009, established an appropriate response by the District's staff to Student's behavioral outbursts.  District Exs. 4-5.  One notable incident, which the ALJ referenced as an outlier in Student's record of otherwise improving behavior, was titled the "pig race incident."  Tr. 75.  Mr. Page testified that the IEP adequately addressed incidents like these because, while memorable, Student was able to regain composure afterwards and finish the school day.  Page Test., Tr. 419 (Feb. 24).  Based on this evidence, the ALJ did not err by concluding that the District had no duty to reevaluate Student's eligibility for services based on his behavior until the spring of 2011.

### D.    **Provision of a FAPE**

With respect to the ALJ's second conclusion of law that the District provided Student a FAPE, Student raises one procedural violation based on the failure to include a regular teacher on the January 2009 IEP team.  His remaining claims of error challenge the substance and implementation of the three IEPs operative before March 2011 (January 2009, December 2009, and December 2010).

///

///

1.    **Absence of a Regular Teacher from January 2009 IEP Team**

Student argues that the ALJ erred by finding no procedural violation based on the absence of Student's regular education teacher from the January 2009 IEP team.  Oregon requires the IEP team to include "[a]t least one regular education teacher of the child, if the child is or may be participating in the regular education environment, consistent with section (4) of this rule."  OAR 581-015-2210(1)(c).  Section (4) provides as follows:

> (4) The regular education teacher of the child must participate as a member of the IEP team, to the extent appropriate, in the development, review, and revision of the child's IEP, including assisting in the determination of:
> (a) Supplementary aids and services, program modifications and supports for school personnel that will be provided for the child; and
> (b) Appropriate positive behavioral interventions and supports, and other strategies for the child.

The ALJ did not err for two reasons.  First, at the time the IEP was written, Student was not attending the regular education classroom.  Page Test., Tr. 235 (Feb. 23).  Second, the IEP team did not plan for the possibility that the Student might participate in the regular education environment during that school year.

For kindergarten, Student had been placed in the communications resource classroom ("CRC") at Stafford.  Aglipay Test., Tr. 102 (Aug. 14).  The January 2009 IEP was written in anticipation of Student's move from Stafford to the AA classroom at Boones Ferry.  Ziolko Test., Tr. 18-19 (Feb. 23).  According to the testimony of the District's special education coordinator, Jennifer Ziolko, the IEP team did not anticipate that Student would mainstream that year.  *Id.* ("We just wanted a successful transition and to get him over to the new school.").  That was Mr. Page's perspective as well.  Page Test., Tr. 236 (Feb. 23) ("our initial strategy was to have — you know, we were working towards having — integrating him into our [AA] classroom

and him being a part of our [AA] classroom community.").  Any mainstreaming that did occur

during 2009-10 year did not cause a retrospective violation.

> For one thing, actions of school systems cannot, as appellants would have
> it, be judged exclusively in hindsight.  An IEP is a snapshot, not a
> retrospective.  In striving for "appropriateness," an IEP must take into
> account what was, and was not, objectively reasonable when the snapshot
> was taken, that is, at the time the IEP was promulgated.

*Roland M. v. Concord Sch. Comm.*, 910 F2d 983, 992 (1st Cir 1990); *see also Fuhrmann v. E.*

*Hanover Bd. of Educ.*, 993 F2d 1031, 1040 (3rd Cir 1993) ("the measure and adequacy of an IEP

can only be determined as of the time it is offered to the student, and not at some later date.").

Student argues that the January 2009 IEP Nonparticipation Justification (the section

explaining why a student will not participate in regular education) suggested that he was

expected to be involved in the regular education environment.  District Ex. 1, p. 13 ("[Student] is

removed from the regular education classroom over 5-6 hours per day, out of a 6.5 hour day.  He

attends lunch and 2 recesses on a daily basis, with peers.  Some days, [Student] spends more

times with peers (in the general ed classroom ).").[5]  As support, he cites *Federal Way*, 394 F3d at

648, where the record supported an inference that the student possibly would be placed in a

regular education classroom based on his previous placement in a regular kindergarten classroom

after attending a regular preschool class for three years.

In contrast here, Karen Menne, an Instructional Coordinator who represented the District

on the January 2009 IEP team, explained that the 0.5-1.5 hours spent by Student outside of

special education would be spent with regular education classmates at lunch and recess.  Menne

Test., Tr. 630-31 (Feb. 24).  This peer interaction could also take place in the general education

---

[5] The January 2009 IEP was expected to govern Student until June 6, 2010.  District Ex. 1, p. 1.  In fact, the IEP team reconvened earlier on December 10, 2009.  *Id*, Ex. 12.  By then, mid-way through second grade, Student was participating with his partner regular education class.  Page Test., Tr. 238-39 (Feb. 23).  Accordingly, the December 2009 IEP team included a regular education teacher, Genevieve Stevens-Johnson, who taught Student music.  *Id*, p. 1.  Student maintains that Ms. Steven-Johnson was not present at the December 2009 IEP meeting, but provides no evidentiary support for this claim.

classroom.  *Id.*  Whatever additional time Student spent in the regular education classroom did

not include instruction from the general education curriculum.  As specifically stated in the

placement selection chart in the IEP, Student did "[n]ot engag[e] in general education

curriculum."  District Ex. 1, p. 14.  Rather, the record suggests that the anticipated time in the

regular education classroom was for lunch.  *See* Page Test., Tr. 238 (Feb. 23) (the policy at

Boones Ferry required students to eat lunch in their classrooms).

In any event, any procedural error that might have occurred was harmless.  "Where a

school district improperly constitutes an IEP team, IDEA procedural error may be held

harmless."  *Napa Valley*, 496 F3d at 938 (citation and internal quotation omitted).  The reason

for mandating a well-rounded IEP team is that "[a]n IEP which addresses the unique needs of the

child cannot be developed if those people who are most familiar with the child's needs are not

involved or fully informed."  *Amanda J.*, 267 F3d at 892.  The failure "to consider the

recommendations of persons who were the most knowledgeable about the child," indicates the

violation of a district's "duty to conduct a meaningful meeting with the appropriate parties" and,

accordingly, the failure to "develop a complete and sufficiently individualized educational

program according to the procedures specified by the Act."  *Federal Way*, 394 F3d at 645, citing

*Target Range*, 960 F2d at 1485 (the district erred by formulating the IEP without input from any

of the students' current parochial school teachers who were the most knowledgeable about

educating him).[6]

Ms. Menne clarified that Student's mainstreaming was so limited when the January 2009

IEP was written that no regular education teacher was knowledgeable about Student's behavior

---

[6] *Federal Way* cannot be read to hold that the failure to include at least one regular education teacher is a structural defect that irrefutably causes the denial of a FAPE.  *Federal Way*, 394 F3d at 646.  Judge Gould's concurring opinion clarifies that procedural deficiencies can still be held harmless under *Target Range* and other Ninth Circuit precedent, none of which *Federal Way* overturned.  *Id* at 651-52 (Gould, C.J., concurring) ("IDEA procedural error may be held harmless in appropriate cases, and this may include cases involving a mistake in how the IEP team was constituted.").
.

or educational progress.  Menne Test., Tr. 627, 630 (Feb. 24) ("[H]e did not spend time in a

general education classroom" such that Student had "a general education teacher who was

familiar with him.").  IAs, primarily Ms. Switzer, accompanied Student to lunch and recess.

Ziolko Test., Tr. 116-17 (Feb. 23); Switzer Test., Tr. 235-55 (Feb. 28).  There is no evidence that

the regular education teacher had any contact with the Student when lunch was held in the

general education classroom.  Moreover, Ms. Ziolko confirmed that no regular education teacher

had previously worked with Student at Stafford to provide input, written or otherwise.  Ziolko

Test., Tr. 116 (Feb. 23).

Thus, the ALJ did not err in finding the District provided a FAPE despite the lack of a

regular education teacher on the January 2009 IEP team.

## 2.    Deficient IEPs

Most of the allegations in the Due Process Complaint accuse the District of substantive

violations by failing to:  (1) determine Student's Present Levels of academic and functional

performance and set quantifiable Annual Goals ("AGs"); (3) provide Extended School Year

Services ("ESY"); and (3) properly implement the IEPs.  The ALJ focused his analysis of such

allegations to the core question of "whether the Student received educational benefit."  Tr. 74.

"[T]he correct standard for measuring educational benefit under the IDEA is not merely

whether the placement is reasonably calculated to provide the child with educational benefits, but

rather, whether the child makes progress toward the goals set forth in her IEP."  *Cnty. of San

Diego v. Cal. Special Educ. Hearing Office*, 93 F3d 1458, 1467 (9th Cir 1996) (internal quotation

omitted).  Whether the IEP is reasonably calculated to enable the child to "achieve passing marks

and advance from grade to grade" are both "important factor[s] in determining educational

benefit."  *Rowley*, 458 US at 203-04.  Thus, the issues with respect to the three IEPs are whether

they were reasonably calculated to provide Student an educational benefit and whether Student made progress towards their goals.

<h4>a.    <u>AGs/Present Level Data</u></h4>

Student alleges that he failed to make progress in reading, writing, and math.  The ALJ disagreed, citing testimony that Student made meaningful progress towards the January 2009 IEP goals, improving in word recognition, reading, comprehension, writing, math, social communication, and behavior.  Ziolko Test., Tr. 75 (Feb. 23); Patterson Test., Tr. 241 (Feb. 23); Page Test., Tr. 263 (Feb. 23); District Exs. 1, 6.  Mr. Page also testified that the present level information for the December 2009 IEP reflected progress toward Student's IEP goals in the same areas.  Page Test., Tr. 268- 75 (Feb. 23); District Ex. 12.  His testimony was similar with regard to Student's progress under the December 2010 IEP, making note of good and even "great progress" in the areas of math, reading, writing, and social behavioral.  District Ex. 19; Page Test., Tr. 434-37 (Feb. 24).

The progress notes for June 2011 (District Ex. 38) reflect that the Student showed improvement in his fluency, tone and recall of facts and details, even with the behavioral challenges that he experienced starting March 2011.  Page Test., Tr. 516-19 (Feb. 24). Regarding math, Mr. Page testified that despite the behavioral challenges, Student still had made some progress in areas such as counting and telling time.  *Id* at 519-20.  Regarding the social communication goal, Mr. Page indicated that the Student in one-to-one settings would "often respond to teacher directives" but struggled interpreting the size of problems and would sometimes react aggressively to redirection.  *Id* at 520-21.  Regarding the writing goal, Mr. Page testified that Student showed "great improvement" in written output, variety of sentence length, clarity of sentences and, with reminders, was able to insert conventions at a higher rate.  *Id* at

522-23.  On this writing goal, he was at around 50% in terms of punctuation which was close to achieving the goal of 2/3 opportunities, or roughly 67%.  *Id* at 523-24.

Mr. Page explained that the AGs are the IEP team's "best estimate" of the Student's academic standing a year later.  *Id* at 524-25.  Sometimes Student achieved that AG within six months, while other AGs, such as the ability to write three sentences, carried over into subsequent years.  *Id* at 525.  Even where a student has not fully achieved a set AG after one year, evidence that Student was "moving forward" towards the goal demonstrated meaningful progress.  *Id* at 525-27.  Mr. Page's testimony mirrors the IDEA standard for delivery of an educational benefit as measured by progress, not completion.

A student's IEP team decides how to measure progress toward the student's AGs. 34 CFR § 300.320(a)(3)(i).  Student claims that he was denied a FAPE because both the January and December 2009 IEPs lacked sufficient baseline data to establish his present levels or to align with the criteria used in the AGs.  Relying on the testimony of Mr. Page and citing *Ashland Sch. Dist. v. Parents of Student R.J.* (*Ashland*), 585 F Supp2d 1208 (D Or 2008), *aff'd* 588 F3d 1004 (9th Cir 2009), the ALJ concluded that numeric baseline data was unnecessary to comply with the IDEA.  Tr. 75-76.  As correctly stated by the District, this court has rejected similar arguments by parents regarding progress and measurability toward their student's AGs:

> The ALJ's opinion appears to presume that a school must make each social and behavioral objective numerically quantifiable and then furnish numerical progress reports, for instance, "student demonstrates productive classroom behavior 32% of the time," or "student had an average of 3.2 positive social interactions each day."  For many if not most teenage students, that degree of reporting is neither feasible nor desirable.
>
> The IEP and the reports provided to Parents quantified that which is readily capable of being quantified, such as the number of hours per week a particular service would be provided, a description of the service, R.J.'s attendance record, and her grades . . . [T]here is no easy way to quantify goals such as having the right friends or making good decisions.

*Ashland*, 585 F Supp2d at 1229.

When comparing the present levels to the goals in the December 2009 IEP, Mr. Page noted that while not all the Present Level of Educational Performance ("PLEP") academic areas had numerical levels, he and the IEP team relied on work samples, knew what Student was currently working on in class, and knew his current areas of need. Page Test., Tr. 411-12 (Feb. 24); District Ex. 12. For gauging behavioral progress, the team properly discussed and relied on positive and negative behavior incidents in forming the IEP. *Id.* For the social communication behavioral goal, Mr. Page used the scale (with which Melissa O'Kelley, Student's speech language pathologist, agreed) of "rarely" to "often" to improve Student's behavior. O'Kelley Test., Tr. 16-18 (Feb. 28). Accordingly, the January and December 2009 IEPs met the substantive standards for measuring academic progress.

Moreover, the Parents (at least the Mother) participated in establishing Student's present levels and AGs at the January 2009, December 2009 and December 2010 IEP meetings. District Ex. 2, p. 1 (January 2009); *Id*, Ex. 12, p. 1 (December 2009); *Id*, Ex. 19, p. 1 (December 2010). There is no evidence that during those meetings, they objected to the lack of baseline data or rating scales. Had the Parents objected, the District might have changed its approach. Even so, a parent's right to participate is not equivalent to the right to have all his or her requests granted because the District makes the ultimate decision regarding the extent of services its students require. *See Lachman*, 852 F2d at 297.

Under Oregon law, IEPs must include: "A statement of the child's present levels of academic achievement and functional performance, including how the child's disability affects the child's involvement and progress in the general education curriculum." OAR 581-015-2200(1)(a). The purpose of present levels "is to establish a baseline relative to which the

teaching staff and IEP team may determine goals and objectives and against which they measure student progress." *Sheridan Sch. Dist.*, 04-054-011, 109 LRP 65849, at *8 (OSEA June 14, 2004). Present levels must be stated in specific terms in order to "inform a revision of the IEP." *Id* at **8-10. Present levels provide a roadmap to further integration, "so that approaches for ensuring the child's involvement and progress in the general curriculum . . . can be identified." *Id* at *9 (citation omitted).

In *Sheridan Sch. Dist.*, two of the student's four IEPs did not include a statement of present levels of performance, and three of the IEPs did not explain how the child's disability would affect involvement and progress in regular education. *Id* at **9-10. In contrast, all of Student's IEPs included statements of his present level of educational performance, with separate sections for levels in academic, as well as developmental and functional, performance. District Ex. 1, p. 3; Ex 12, p. 3 & Ex. 19, p. 3. Each IEP also included a section explaining how Student's level was affecting his involvement and progress in the regular school setting. *Id.* The present levels were sufficiently specific in all the IEPs, such that they informed the future IEPs.

However, with one exception, descriptions of the impact that Student's present levels were having on his progress in general education were vague. In the January 2009 IEP, this section was very helpful to identifying approaches for ensuring Student's involvement with his regular education partner class. The IEP team noted environments that triggered Student's misbehavior and could be avoided or mitigated — namely noise, which made attendance at assemblies difficult, and group activities such as standing in line or competitive games. District Ex. 1, p. 4. In contrast, the December 2009 and December 2010 IEPs included only one conclusory sentence in this section that "[Student's] academics and behavioral challenges make

it difficult for him to be successful in the general education classroom." *Id*, Ex. 12, p. 4 & Ex 19, p. 4 (similar language).

When the December 2009 IEP was written, Student was at the peak of his integration with the general education setting by attending music, lunch, and recesses with his partner regular education class. The failure to detail obstacles to Student's further integration was not material as he was receiving the benefits of the regular education setting. However, by the time the December 2010 IEP was written, Student's integration had decreased. In September 2010, Mr. Page stopped sending Student to music. *See* Mother Test., Tr. 67-69 (Aug. 15); Page Test., Tr. 598 (Feb. 24). Also, Student was no longer engaging with regular education students at recess. Mother Test., Tr. 69 (Aug. 15). After the December 2010 IEP, Student became increasingly isolated from the regular education setting, eventually leading to a denial of a FAPE in the spring of 2011, as explained below. Failing to explain whether Student's present behavioral levels in December 2010 were keeping Student out of regular educational opportunities may have contributed to denying Student a FAPE in the spring 2011, by not tracking the reduction in opportunities to interact in social settings outside the AA classroom. The IEP team might have avoided Student's behavioral downturn had it properly detailed his present levels in December 2010, and perhaps even in December 2009. However, the ALJ did not err in his treatment of this evidence because he found the District did not deny Student a FAPE until the spring of 2011 when the impact of District's failure to analyze how Student's present levels negatively impacted his integration began affecting his access to education.

b.    **ESY Services**

Student contends that the IEP team did not explain his exclusion from ESY over the summers before his 2009-10 and 2010-11 school years. Again, the ALJ reasonably found that

the Parents failed to prove they objected to the ESY determination at the IEP meeting, relying on Mr. Page's testimony.  Tr. 76; Page Test., Tr. 277 (Feb. 23).  Even if they had objected, Student did not meet the standard of eligibility for ESY.  As held by most circuits, ESY are only necessary to a FAPE when the student is at risk of undue regression without receiving special services over the summer.  *See, e.g.*, *JH v. Henrico Cnty. Sch. Bd.*, 326 F3d 560, 567 (4th Cir 2003); *Todd v. Duneland Sch. Corp.*, 299 F3d 899, 906-07 (7th Cir 2002); *Cordrey v. Euckert*, 917 F2d 1460, 1470 (6th Cir 1990).  The IEP team determined that Student's record at the end of the 2009-10 school year did not demonstrate a risk of undue regression.  District Ex. 1, p. 13 (Jan. 2009 IEP); Ex. 12, p. 14 (Dec. 2009 IEP) & Ex. 19, p. 11 (Dec. 2010 IEP).  Mr. Page testified that Student did not fit the profile at that time of a child needing ESY because, even without such services the prior summer, he made progress the following school year.  Page Test., Tr. 276-77 (Feb. 23).  Student did not present any evidence that he experienced undue academic regression during the 2009-10 and 2010-11 school years.

### c.    Implementation of January and December 2009 IEPs

Next, Student alleges that the January and December 2009 IEPs were not reasonably calculated to provide an educational benefit because the District failed to properly implement it by not educating Student's IAs with the IEPs and not providing adequate progress reports to the Parents.  A "*material* failure to implement an IEP violates the IDEA."  *Van Duyn ex rel. Van Duyn v. Baker Sch. Dist. 5J*, 502 F3d 811, 822 (9th Cir 2007).  A failure is material "when there is more than a minor discrepancy between the services a school provides to a disabled child and the services required by the child's IEP."  *Id.*  The standard "does not require that the child suffer demonstrable educational harm in order to prevail.  However, the child's educational progress, or

lack of it, may be probative of whether there has been more than a minor shortfall in the services provided." *Id.*

The ALJ did not find any IDEA violation based on the unfamiliarity of the IAs (Ms. Like and Ms. Switzer) with Student's IEPs. Neither IA had attended the IEP planning meetings or read the final plans. Like Test., Tr. 126-28 (Feb. 28); Switzer Test, Tr. 239-41 (Feb. 28). However, throughout this time period, Mr. Page was still Student's primary teacher. *See* District Ex. 31. Ms. Like and Ms. Switzer took direction on how to assist Student from Mr. Page. Like Test., Tr. 127 (Feb. 28); Switzer Test., Tr. 241 (Feb. 28). Presumably, Mr. Page's knowledge and commitment to the operative IEP informed the instructions he gave the IAs. Thus, the Parents failed to prove that the District staff incorrectly implemented the IEPs. Accordingly, the ALJ did not err by concluding that the Student received an educational benefit prior to the spring 2011.

Student also argues that the inadequacy of his progress reports failed to track his progress towards the Reading, Writing, Social Communication, and Social Behavior AGs, which led to subsequent inaccurate IEPs. The IDEA only requires that periodic reports on the progress the child is making toward meeting the [AGs] . . . be provided. 20 USC § 1414(d)(1)(A)(i)(III); 34 CFR 300.320(a)(3). The IDEA does not require that progress reports contain numeric specificity in documenting the child's progress towards the AGs. *See M.M. ex rel. L.R. v. Special School Dist. No. 1*, 512 F3d 455, 460-61 (8th Cir 2008) (holding that quarterly progress reports merely listing percentage-based grades for various subjects were sufficient).

The District sent home progress reports during June of each school year, containing Student's status as of December and June of that school year. Page Test., Tr. 685 (Feb. 24) (Mr. Page sent the reports home in the students' backpacks). All progress reports included

explanations of Student's development towards each AG:  Reading, Writing, Social

Communication, and Social Behavior.  District Ex. 6 (June 5, 2009 report); District Ex. 15 (June

10, 2010 report); District Ex. 38 (June 3, 2011 report).

Contrary to the Student's contention, the progress notes are highly detailed.  A few

highlights include:  (1) notes in the June 2011 report in relation to Student's reading goal of

"looking back in the text to support his answers" that Student "looked back" on three occasions

to find answers which were correct twice and incorrect once (District Ex. 38, p. 1); (2) notes in

the June 2010 report in relation to Student's math goal of "telling the time to the minute using an

analogue clock" that Student still only told time to the half hour consistently (*id*, Ex. 15, p. 3);

(3) notes in the June 2011 report in relation to Student's writing goal of independently writing

five grammatically correct sentences that Student had demonstrated that he could write five to

seven sentences on a chosen topic (*id*, Ex. 38, p. 6); and (4) notes in the June 2009 report in

relation to the Social Behavior goal of self-monitoring his behavior that Student was

transitioning independently but needed to continue to work on responding appropriately to adults

and not making fists.  *Id*, Ex. 6, p. 6.

Student contends his Parents would have become involved earlier to ensure that he

received an educational benefit if the progress reports had accurately reported his progress.  But,

as explained above, Student made meaningful progress during this period.  Adding specificity to

the progress notes would not have revealed digression in the Student's achievement.

Furthermore, the ODE has recently clarified that:

> There is no prescribed remedy for parents when a school district fails to
> inform them of a student's progress toward IEP goals as required under 34
> CFR 300.320(a)(3).  Oregon has viewed a failure to inform parents in this
> regard as a procedural as opposed to substantive violation of the IDEA,
> which may or may not deny a student a free appropriate public education
> (FAPE).  Additionally, courts nationwide have refused to find IDEA

violations based on a district's failure to give progress reports at IEP
meetings, where parents otherwise fully participated in the development of
their child's IEP.

*In the Matter of Portland Pub. Sch. Dist.*, Case No. 13-054-14, at *7.

Based on the record, the Parents were regularly in contact with teachers and
administrators through meetings, telephone calls, and emails, and had ample opportunity to seek
updates on Student's progress. Thus, any inadequacies in the progress reports did not amount to
a material failure.

### E.    Appropriate Placement

Finally, Student disagrees with the ALJ's third conclusion of law that the District
provided him with an appropriate placement until the spring of 2011. The educational placement
of a child with a disability is made by the "placement team" which consists of parents, teachers,
"and other persons knowledgeable about the child, the meaning of the evaluation data, and the
placement options." 34 CFR § 300.116(a)(1). The final placement decision: "(1) is determined
annually; (2) is based on the child's IEP; and (3) is as close as possible to the child's home." 34
CFR § 300.116(b). A district violates the IDEA if it proposes placement in "a preexisting,
predetermined program" without any flexibility to consider alternatives. *Target Range*, 960 F2d
at 1484.

### 1.    Predetermination

Student first argues that his placement violated the IDEA because the District had
predetermined his placement prior to each IEP meeting. "[P]redetermination occurs when an
educational agency has made its determination prior to the IEP meeting, including when it
presents one placement option at the meeting and is unwilling to consider other alternatives."
*H.B. v. Las Virgenes Unified Sch. Dist.*, 239 Fed App'x 342, 344 (9th Cir 2007). Such

predetermination violates the IDEA "regardless of the discussions that may occur at the meeting" because parents "must have the opportunity for *meaningful* participation in the formulation of IEPs." *Id.*

Student contends that at no IEP meeting did the District considered placing him in any setting other than the self-contained AA classroom at Boones Ferry, obtain input from any regular education teacher, or make changes to the draft IEPs based on the Parents' concerns or input. Those contentions are unsupported by the record.

As Student concedes, all of the IEPs list alternative placement options, including regular education with support. The January 2009 IEP lists four placement options, two of which are self-contained classes. The three placement options in the other three IEPs are regular education with support, regular education with pull-out services, or a self-contained classroom.

Further, as discussed above, a regular education teacher was not required at the January 2009 IEP meeting, and the December 2009 IEP team included Student's music teacher.

Finally, as discussed above, the Parents participated in every IEP meeting and had ample opportunities to discuss the IEPs. The testimony at the hearing shows that the Parents did not express disagreement on the vast majority of IEP components, including placement. This is not a situation, as in *Target Range*, where the school district presented an IEP that considered only one placement option, did not consider alternatives "despite the objections of" the parents at the meeting, and assumed a "take it or leave it" posture regarding placement at the meeting. *Target Range*, 960 F2d at 1484.

As demonstrated by the IEPs, Student's placement team struck the appropriate balance between providing Student both with special education instruction and an opportunity to socialize with regular education students in his peer group. The IEP team's decision to place

Student in a mixture of general and special education classrooms is consistent with the IDEA's policy of "mainstreaming," which attempts to educate disabled students with non-disabled students to the fullest extent possible. *See* 20 USC § 1412(5). Ultimately, the placement team always chose the option which, in its collective opinion, gave Student the best access to material and could provide Student with instruction at the level he was learning.

### 2.    <u>Sending Student Home Early</u>

Student contends the District failed to properly implement the IEPs by sending him home early more often than allowed, depriving him of numerous days of instruction. According to Student, Mr. Page requested the Parents to pick him up early from school about once per week because of uncontrollable behavior during the period when the January 2009 IEP was in effect. The revised Behavior Protocol provided that "if [intense/severe] behavior continues, designated person may call parents as warranted after 30 min[utes]." District Ex. 5, p. 2. "Intense/severe" behavior was defined as "throwing objects, hitting, kicking, etc." *Id.* Student maintains that Mr. Page routinely requested the Parents pick him up for only mild behavior problems.

The ALJ found that the Parents failed to prove that the District sent Student home excessively during that period. Tr. 76. Based on the District's sign-out book and the testimony of Ms. Patterson and the Mother, the ALJ interpreted the record to show that the Parents picked up Student early from school only "five times for reasons not related to behavior." Tr. 60-61, 76.

Ms. Patterson summarized the sign-out sheets for both school years at Boones Ferry. The 2009-10 sign-out sheets show that Student was signed out on: 4/14/10 by grandmother for being sick at 9:56 am; 4/16/10 by the Mother for an appointment; 5/10/10 as sick by the Mother; 3/19/10 by the Mother for vacation; 1/29/10 by the Mother for both Student and his sister. Patterson Test., Tr. 179-81 (Feb. 23). Even the Mother confirmed that during 2009-10, she did

not recall being called frequently to pick up Student; rather, she could only recall coming in some mornings to help calm Student down if he was a having a rough start to the day and help him restart his day.  Mother Test., Tr. 42 (Aug. 15).  She added that this approach of restarting or resetting Student's day was effective.  *Id* at Tr. 44-45.  According to the 2010-11 sign-out sheets, Student was signed out only four times before March 2011:  12/17/10 by the Mother at noon for an appointment; 12/10/10 by the Mother at 1:40 pm to play "hookey;" 12/7/10 by the Mother for illness; 9/13/10 by the Mother at 11:30 am with no reason given.  Patterson Test., Tr. 181-83 (Feb. 23).  Mr. Page testified that for the entire 2010-2011 school year, he recalled only three or four times when he had to invoke this provision of the behavior protocol.  Page Test., Tr. 394 (Feb. 24).  He added that:

> having the Student go home was, I felt like, a mutually agreed upon situation between myself and the parent.  I felt like it was a situation where we both had the Student's best interest in hand * * * in our hearts and that what we were trying to do was at times help him end on a high note, help him end without pushing him so that the behavior increased to the point where he did do something that * * * would have a major consequence.

*Id* at 394-95.

In response, Student maintains that the sign-out sheets are not reliable.  However, Student's father testified that he only failed to use the sign-out sheets on two occasions because he was angry or embarrassed.  Father Test., Tr. 142-43 (Aug. 14).  The testimony of Student's private tutor, Karen Roberts, is similarly inconclusive since her invoices did not indicate whether she tutored Student because he was on vacation or sent home early from school.  Roberts Test., Tr. 77 (Feb. 29).  Student presented no other evidence to contradict the reliability of the sign-out sheets.

Regardless, all decisions to send Student home early due to misbehavior were made in conjunction with the Parents.  Mr. Page found only one e-mail where he requested the Parents to

come and pick Student up from school.  Page Test., Tr. 395 (Feb. 24).  His remaining e-mails

were updates to the Parents of Student's status during the day, and in most cases, the Mother

would ask whether she needed to come and pick up Student.  *Id*.  Oftentimes, he would check in

with the Mother to indicate that Student was having a tough time in class; the Mother would ask

if she should pick him up; and he would respond that this was not necessary because the staff

was able to help Student continue in class.  *Id* at 582.  Ms. Like confirmed that any decision to

have Student go home early was not made unilaterally by Mr. Page, but was made in

consultation with the Parents.  Like Test., Tr. 168 (Feb. 28).

Because Student has failed to sustain his burden of proof on this issue, the ALJ did not

err.

### F.    Conclusion

For these reasons, the preponderance of the evidence fails to support Student's challenges

to the ALJ's conclusions of law that the District did not violate the IDEA during the 2009-10

school year.

## II.    District's Appeal

With respect to the 2010-11 school year, the ALJ made the following conclusions of law

adverse to the District:

> (4)  The District failed to evaluate the Student in all areas of
> suspected disability during the 2010-2011 academic year.
> (5)  The District failed to provide the Student a FAPE during the
> 2010-2011 academic year.
> (6)  The District failed to provide an appropriate placement for the
> Student during the 2010-2011 academic year.

Tr. 73.

Accordingly, he ordered the District to reimburse the Parents $17,000.00 for the tuition

costs of private placement at Victory Academy for 10 months from September 2011through

August 2012 and to continue to reimburse the Parents for tuition at Victory Academy during the 2012-13 school year in the amount of $1,700.00 per month until it provided Student a FAPE. Tr. 83. However, the ALJ refused to order District staff to participate in training for IEP development, functional behavior process, and appropriate placement. *Id.*

### A.      Denial of a FAPE

The ALJ's  conclusion that the District failed to provide Student a FAPE was based on a series of "events from late February or early March 2011 until the end of the school year demonstrate[ing] that . . . Student had lost [an] educational opportunity and that the Parents' opportunity to participate in the IEP process had been seriously impaired." Tr. 77, 81. Until then, "Student continued the success he/she enjoyed the previous year and did well in the classroom and had positive experiences in his/her partner class." *Id.*

The Final Order does not reference any evidence[7] that Student suffered a loss of access to educational opportunities. However, as explained above, the denial of a FAPE may be based on a procedural violation that seriously impaired the parents' opportunity to participate. According to the ALJ, the District's response to Student's increasing misbehavior led to three procedural violations: (1) Ms. Krieg being absent from the December 2010 IEP team (Tr. 77); (2) the District's failure to timely initiate a reevaluation and Functional Behavioral Assessment ("FBA") (Tr. 80); and (3) the District's failure to convene an IEP meeting (*id*).

### 1.      Absence of Ms. Krieg on December 2010 IEP Team

As set out above, the failure to include at least one regular education teacher may cause the denial of a FAPE under some circumstances, but not others. The ALJ did not err by finding that the absence of a regular education instructor from the December 2010 IEP team denied the

---

[7] The ALJ did reference Student's increasing depression in early 2011 manifested in statements such as "I want to die," and "nobody likes me." Tr. 80. While suggesting a sense of isolation from his peers, these expressions of sadness do not indicate a diminished access to an education.

Parents' input, even though the omission had been harmless during the January 2009 IEP process.

During the second grade (2009-10), there was "quite a bump" in the level of Student's mainstreaming.  Page Test., Tr. 238 (Feb. 23).  At the beginning of that school year, he attended music class, in addition to lunch and recess, with his regular education classmates, taught by Margot Patula.  *Id* at 238-39.  He attended all the recesses with this partner class, sometimes without an IA; attended music with Ms. Stevens-Johnson by himself; and joined PE class with the other AA students.  *Id.*  Halfway through the year, the December 2009 IEP team included Ms. Stevens-Johnson, and the resulting IEP reflected that Student was being "served in a self-contained special education program through the day (over 60%) except for music, lunch, and recess."  District Ex. 12, p. 14.

Student started third grade (2010-11) by attending lunch and recess with Ms. Krieg's regular education class.  Krieg Test., Tr. 194-96 (Feb. 27).  On November 29, 2010, the District notified the Parents in writing that an IEP meeting was scheduled for December 7, 2010, and that Ms. Krieg had been invited to attend.  District Ex. 17.  Although Mr. Page and Ms. O'Kelley were at the meeting, Ms. Krieg was unable to attend.  District  Ex. 19, p.  1.  The IEP team decided that due to the approaching IEP deadline and other scheduling difficulties, it would hold the IEP meeting without Ms. Krieg.  Mother Test., Tr. 66 (Aug. 15).  The Mother would have been willing to reschedule the meeting so Ms. Krieg could attend (*id*), but signed an agreement that Ms. Krieg's attendance was not required, provided that she "submits in writing to the team input into the IEP before the meeting."  District Ex., p. 18.  Ms. Krieg never provided that

written input.  Mother Test., Tr. 66 (Aug. 15). [8]  As a result, no regular education teacher attended or provided input in the December 2010 IEP process.

Unlike the situation in January 2009, the December 2010 IEP team undoubtedly expected that Student may be participating in the regular education classes.  Accordingly, the December 2010 IEP allowed as much mainstreaming as "appropriate."  District Ex. 19, p. 12.  Moreover, Mr. Page and the Mother discussed ways to reenroll Student in music, after Mr. Page stopped sending him with his partner class because of a scheduling conflict.  Mother Test., Tr. 67-69 (Aug. 15).

More importantly, by December 7, 2010, several regular education instructors were knowledgeable about Student's behavior in the regular education environment, while transitioning in the hallway, and during lunch and recess.  Student was participating in Ms. Krieg's class every day and was under her supervision during that time through April 24, 2011.  Krieg Test., Tr. 196 (Feb. 27).  He ate lunch with the class and stayed through a read-aloud session and recess.  *See id* at 195.  In addition, he attended music class with the fourth grade substitute teacher for a short time and regularly attended Ms. Stevens-Johnson's class until May 2010.  Menne Test., Tr. 598-99 (Feb. 24).  Based on her knowledge of teaching Student, Ms. Stevens-Johnson served as the regular education teacher on the previous IEP team in December 2009.  District Ex. 12, p. 1.

The Mother testified that the Ms. Krieg's absence impaired her ability to participate at the December 2010 meeting.  Because one of the Parents' goals was to make Student's general education participation more successful and free of misbehavior, they expected to receive

---

[8] Because the agreement was signed on the day of the December 7, 2010 IEP meeting, it is unclear whether the word "meeting" refers to that meeting or a subsequent one.  However, the December 7, 2010 meeting was the only meeting held in regard to the December 2010 IEP.

updates and discuss Student's behavior in these environments at the IEP meeting.  Mother Test.,

Tr. 67-68 (Aug. 15).  As the Mother explained:

> So it was important to me that he gets general ed.
> * * *
> I asked specifically, "how is he doing in music?"  Because Mrs.
> Krieg wasn't there, and she couldn't talk about lunch, although he seemed
> to be doing fine during lunch. . . .  But it would have been really nice to
> have learned at that December meeting exactly what was going on.

*Id* at 67-74.

Thus, as found by the ALJ, the Parents' ability to participate in addressing some of the

limitations that the regular education teachers experienced was impaired by a complete absence

of their input in formulating the December 2010 IEP.

### 2.    Failure to Conduct a Reevaluation

The ALJ found that the District failed to conduct a reevaluation by April 2011 when

"Student's physical aggression and other behavioral problems warranted a reevaluation" under

20 USC § 1414(a)(2) and OAR 581-015-2115.  Tr. 79.  A school district must reevaluate a

student for educational needs if it "determines that the educational or related services needs,

including improved academic achievement and functional performance" warrant reevaluation, or

"if the child's parents or teacher request a reevaluation."  20 USC § 1414(a)(2)(A); 34 CFR

§ 300.303.  A reevaluation requires prior notice to the parents.  OAR 581-015-2110(2).

The District first argues that the ALJ erred in finding that it should have reevaluated

Student as early as April 2011.  School districts are required to evaluate disabled students at least

once every three years, but not more than once per year.  20 USC § 1414(a)(2)(B); 34 CFR

§ 300.303(b)(2); OAR 581-015-2105.  Student does not contend that the District was overdue for

his annual IEP review or that the District failed to reevaluate Student over a three-year period.

Also, under Oregon law, a "reevaluation must be completed within 60 school days from written parent consent . . . to the date of the meeting to consider eligibility, continuing eligibility or the student's educational needs." OAR 581-015-2110(5)(b). A public agency may conduct reevaluations if reasonable efforts to obtain parental consent fail. OAR 581-015-2095(3)(c). Because the District did not solicit consent from the Parents about initiating a reevaluation, this 60-day requirement is not applicable.

Nevertheless, a "public agency must ensure that a reevaluation of each child with a disability is conducted" if it "determines that the educational or related services needs . . . warrant a reevaluation." 34 CFR § 300.303(a)(1); OAR 581-015-2105(4). The record supports the ALJ's finding that the District "had ample evidence by April 2011 that Student's physical aggression and other behavioral problems warranted a reevaluation." Tr. 79.

The ALJ found that Student's behavioral incidents increasingly disrupted his classroom experience beginning in December 2010. Student Exs. 32 (Dec. 11, 2010), 33 (Dec. 14, 2010), 34 (Jan. 5, 2011), 35 (Jan. 12, 2011); Page Test., Tr. 193-97 (Feb. 27) (Student interrupted Ms. Krieg during a read-aloud in February 2011). Again, in March or early April 2011, when Ms. Krieg was reading aloud to the class after lunch, Student shouted at her to stop reading. Krieg Test., Tr. 198 (Feb. 27). Nonetheless, from December 2010 to March 2011, Mr. Page felt Student was successful in calming down and continuing with his school day. Page Test., Tr. 419 (Feb. 24).

But on March 1, 2011, Student punched Mr. Page on the jaw after not being allowed to tell a joke to the AA class. Student Ex. 71. While being led from the classroom, Student tried to "kick, hit, and bite" Mr. Page. *Id.* When the Mother picked Student up after this incident, he began hitting her and pointed his finger as if it were a gun, pretending to shoot her. Student

Ex. 39.  On March 10, 2011, Student verbally threatened Mr. Page and Ms. Like while hissing and making gestures during instructions.  Student Ex. 40.  On March 31, 2011, Student hit another student four times during recess.  Student Ex. 41, p. 2.  That day, Mr. Page noted to the Parents that while Student's "overall demeanor is on the calm side compared to the past," his outbursts "appear more tactical, higher level of threatening . . . to make people feel unsafe."  *Id*, p. 2.  Mr. Page noted another change:  "There seems to be a tone of controlled deviousness and defiance that was not there before."  *Id*, p. 1.  On April 6, 2011, Student made a claw with his hand and swiped Ms. Like.  Student Ex. 49, p. 3.  That same day, Ms. Patterson advised Dr. Kenneth Welch (Director of Student Services) and Ms. Menne that:

> Johh [*sic*], Kathy P and I have persistent concerns around how to best provide support for [Student].  He is becoming increasingly violent, unpredictable, and harder to redirect.  [Mr. Page] has been an invaluable support for [Student] and developed close rapport w/ him and with [Student]'s parents.  Within the last two months, [Student] hit [Mr. Page], hit IAs, hit other students, and been easily angered.  He is swearing often and the overall picture is quite unstable.  He has been sent home twice since Spring Break.  [Mr. Page] reports that he is becoming increasingly unsafe and actually afraid of [Student].  We would welcome the chance to think with you around how we continue to support [Student] and how what [*sic*] we can do to better meet his needs.

Student Ex. 42.

On April 18, 2011, Student told Ms. Like, "I hate you," and made a gun with his hand. District Ex. 22, p. 39.  On April 22, 2011, Student raised his fist in a threatening stance toward Ms. Krieg when she was unable to give Student her full attention while preparing for a fire drill. Student Ex. 48.

This evidence indicates that District administrators and teachers most knowledgeable about Student's history noted a drastic change in his behavior as early as April 6, 2011, and

began discussing his eligibility for more resources.  Thus, as found by the ALJ, the District knew

that Student's current services warranted a reevaluation by April 2011 which was not done.

### 3.    Failure to Obtain Parents' Consent to FBA

In response to Student's escalating behavior problems, Bill Brant, a District school

psychologist, completed an FBA on Student on May 26, 2011.  Student Ex. 63.  The ALJ

concluded that the District "did not obtain the Parents' consent to conduct the FBA" which

"denied the Parents an opportunity to participate in the IEP process and denying Student a

FAPE."  Tr. 79-80.  This finding is based on the ALJ's conclusion that the FBA was a

"reevaluation" under the regulations requiring consent by the Parents which the District did not

obtain.  The District argues that the FBA was not a "reevaluation" requiring prior notice to and

consent by the Parents.  As discussed below, this court agrees with the District.

The IDEA expressly requires an FBA or Behavior Intervention Plan ("BIP") only in

connection with disciplinary changes in placement, such as expulsion or suspension.  20 USC

§ 1415(k)(1)(D)(ii); 34 CFR § 300.530(d)(1)(ii), (f)(1).  However, neither the IDEA nor its

implementing regulations define an FBA or specify procedures for conducting an FBA.[9]  Instead,

guidance is found in opinion letters issued by the Office of Special Education Program ("OSEP")

under the United States Department of Education.

According to the OSEP, "34 CFR § 300.530(d) and (f) of the regulations . . . link the

FBA to the development of a behavioral intervention plan for a child with a disability who is

disciplined for misbehavior."  *Letter to Janssen*, 51 IDELR 253, 108 LRP 65830, at *1 (June 5,

2008).[10]  The OSEP posits that some FBAs are inherently part of a student's reevaluation.

---

[9] "In the case of a child whose behavior impedes the child's learning or that of others, consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior."  34 CFR § 300.324(a)(2)(i).
[10] This citation references the Individuals with Disabilities Education Law Report ("IDELR"), a compilation of legal authorities specific to the IDEA and published by LRP Publications.

"[W]hen an FBA is conducted to help a district determine . . . the extent of special education and related services the child requires, the FBA qualifies as an evaluation or reevaluation." *Letter to Christiansen*, 48 IDELR 161, 107 LRP 45740, at *1 (Feb. 9, 2007).  However, the OSEP has not addressed the use of an FBA to assess IEP-eligible students for other purposes.  Certain assessments are not considered to be an evaluation, such as the "screening of a student by a teacher or a specialist to determine appropriate instructional strategies for curriculum implementation."  34 CFR § 300.302; OAR 581-015-2095(1)(d).  For the same reason, an FBA may not be considered an evaluation or reevaluation.

An FBA "focuses on identifying the function or purpose behind a child's behavior. Typically, the process involves looking closely at a wide range of child-specific factors (e.g., social, affective, environmental)." *Letter to Gallo*, 61 IDELR 173, 113 LRP 19171, at *1 (Apr. 2, 2013) (citation omitted).  It includes "informal, i.e., observation, and formal assessments conducted by teachers to determine appropriate instructional interventions," such as critiquing a failing curriculum.  *Id.*  In other words, FBAs which are administered for the limited purpose of adapting teaching strategies to a child's behavior, as opposed to determining eligibility or changes in placement, could fall outside of the reevaluation requirements.

On May 24, 2011, Ms. Menne asked Mr. Brant to conduct an FBA for Student, while also recommending that Mr. Page instruct Student in a separate location for the remainder of the school year.  Student Ex. 60.  The request was in response to Student's physical altercation with Mr. Page the previous day.  On May 23, 2011, after Mr. Page instructed Student to take a break outside the classroom because he was mouthing cuss words, Student "stood up, pushed [Mr. Page] with both hands in the chest, punch[ed] [him] in the side of [his] head, and then sat back down with his fists up like he was going to hit again."  District Ex. 27, p. 14.  The Mother picked

Student up early from school after the incident, and she and Ms. Patterson decided it was best to keep Student at home the next day. Patterson Test., Tr. 140-41 (Feb. 23). Ms. Menne requested the FBA in anticipation of Student returning to school the following day. Student Ex. 60. Ms. Menne's only stated goal for the FBA was that it be performed as soon as possible. *Id*.

Mr. Brant conducted his assessment according to common practice. Brant Test., Tr. 223-24 (Feb. 27). He set out to isolate the variables contributing to Student's increase in aggression. *Id*. Consistent with his past practice, he first interviewed Student's teacher and next, as was typical, gathered information:

> I talked with Mr. Page and also had Mr. Page complete a – a – just sort of a – a list of questions that I had for him, to try to get an idea of what the behaviors of concern were and his – his observations regarding specific skills that a student would need to have to cope with those kinds of – of situations and then specific circumstances under which those problem behaviors – he had seen these problem behaviors present themselves.
> And then I also – I always routinely want to find out what interventions that a teacher has tried, so that I don't recommend something that they've already done, and so he – he provided me with that information as well.

*Id* at 221-22, 232.

The questionnaire answered by Mr. Page was not standardized, but was an informal checklist that Mr. Brant had obtained at a training session. *Id* at 233; Student Ex. 109 ("Assessment of Lagging Skills & Unsolved Problems"). The resulting FBA summarized past incidents of misbehavior: the surrounding circumstances, the lagging social skills that contributed to those incidents, intervention strategies utilized to respond, and the effectiveness of each response. *Id* at 241-42. Mr. Brant detailed some new response techniques but generally recommended:

> that [Mr. Page] use a collaborative process where he involved the child in the process of developing what it was that they were going to do to try to solve these problems, because [Mr. Brant] found that even with little kids,

> if you can enlist their cooperation and working with you to develop a plan,
> you're more likely to get success.

*Id* at 244.

This FBA was not administered to determine whether Student still qualified for special

education services, as is commonly the objective.  *Letter to Gallo*, at *3 ("[A]n FBA is generally

understood to be an individualized evaluation . . . to assist in determining whether the child is, or

continues to be, a child with a disability.").  In contrast, the targeted purpose of the FBA was

akin to a "screening . . . to determine appropriate instruction strategies for curriculum

implementation," which is not the same as an evaluation.  34 CFR § 300.302; OAR 581-015-

2095(1)(d).  The data relied on by Mr. Brant show an attempt to identify the cause of Student's

behavioral changes by collecting and critiquing existing practices in the classroom.  As explained

in the introduction, Mr. Brant relied on data in four categories obtained from Mr. Page:

> the specific challenging behaviors he has observed that are impeding
> [Student's] ability to successfully perform assigned academic tasks and to
> appropriately interact with peers and adults. . . . the specific situations
> were [*sic*] in which the problem behaviors arise, e.g., the nature of the
> tasks, and the characteristics of the environment. . . . whether [Mr. Page]
> has seen improvement, no change or an escalation of challenging behavior
> over the course of the school year, and what he thinks could account for
> any change. . . . [and] a description of specific intervention strategies he
> and his instructional assistants have employed to help alleviate the barriers
> created by [Student's] challenging behaviors.

Student Ex. 67, p. 1; Brant Test., Tr. 231 (Feb. 27).

Also, the text of the recommendations implies that the FBA's intended audience was

Mr. Page and aides in his classroom.  The suggestions are directed to "you" – who, given the

context, are Student's teachers and not his IEP team:

> A good way to proceed is to begin the process at a time when [Student] is
> the least stressed.  The conservation typically begins with, "I have noticed
> that when I ask that you to [*sic*] being working on _____, you instead
> _____.  "What's up here [Student]?"  (Given [Student]'s challenges with

> explaining things, getting defensive, etc., it helps to reassure him you
> aren't angry with him, he isn't in trouble, etc. to preface the conversation).
> It is also likely that you may experience a lot of pauses on [Student]'s part,
> and it helps to say reassuringly things like, "it looks like you are thinking
> about this [Student]."

Student Ex. 67, pp. 3-4.

In 2009, an ALJ found an even more intrusive assessment to fall outside the definition of an evaluation.  In *Corbett Sch. Dist.*, 109 LRP 26448 (Apr. 10, 2009), the parents alleged that the district failed to obtain their consent before conducting observations of the student on three different occasions.  *Id* at *6.  The observation notes were included in the subsequent IEP to describe how the district would measure the student's progress.  *Id*.  But without evidence that the observations were made at the time with the intent to gather data for an eligibility determination, the ALJ decided that the observations were not evaluations.  *Id*.  Instead, the assessments were "a continuation of the monitoring of the student's progress towards the goal and related short-term objectives identified" in the previous IEP.  *Id*.  Consent was not necessary either for the observations or the review of the observation data, regardless of the purpose of the review.  *Id*.  OSEP later published its opinion that behavioral observation of an individual student required parental consent, but maintained the position that reviews of existing evaluation data did not.  *Letter to Gallo*, at *3.

Mr. Brant did not observe Student's behavior in preparation for writing the FBA.  When viewed simply as a compilation of existing observations made by Mr. Page in the regular course of his teaching, this FBA falls into the category consistently considered not to be an evaluation.

Additionally, the FBA was not written to influence Student's placement, but to guide interactions between instructors and Student in the course of teaching the curriculum.  The survey questions did not ask how Student's environment affected his behavior.  Rather, they

focused on scenarios and instruction techniques that provoked Student's misbehavior. Mr. Brant's recommendations reflect the same focus and, again, imply that the District used an FBA to determine specific teaching techniques to diffuse Student's escalations during the remainder of the year. Suggestions included scripts for communicating with Student and approaches to redirecting misbehavior. There is no mention of the effectiveness of one-on-one instruction or integration into a regular classroom.

Even if the ALJ correctly treated the FBA as a "reevaluation," the consent requirement may not apply. As part of any reevaluation, the IEP team and other qualified professionals must review existing evaluation data on the child and identify what additional data, if any, are needed to determine whether "any additions or modifications to the special education and related services are needed." 34 CFR § 300.305(a)(2)(iv). The LEA also may administer such assessment and other evaluation measures as may be needed. 34 CFR § 300.305(c). If the IEP team determines that no additional data are needed, the district must provide the written notice of that determination and the parents' right to request an evaluation. *Id*; OAR 581-015-2115(4).

If the IEP team determines that it needs additional data "to determine whether the child is or continues to be a child with a disability" or "to determine the child's educational and developmental need," then the district must then satisfy two additional procedural requirements. 34 CFR § 300.305(a)(2); *see* OAR 581-015-2115(1)(b) (similar language). First, the district must provide written notice to the parent "that describes any evaluation procedures the agency proposes to conduct as a result of the evaluation planning process." OAR 581-015-2110(2)(a). Second, the district "must obtain informed written consent for evaluation." OAR 581-015-2110(2)(b). However, earlier information-gathering steps in the reevaluation process do not require parental consent, including "[r]eviewing existing data." OAR 581-015-2095. The

review of existing evaluation data includes "reviews of a student's record conducted in accordance with 34 CFR § 300.305" for which the "public agency is not required to obtain parental consent." *Letter to Gallo*, at *3.

The record supports the District's argument that Mr. Brant's FBA was merely a review of existing data to determine if additional assessments were necessary. The regulations specify that "input from the child's parents" is needed only after the review of existing data when deciding "[o]n the basis of that review, . . . what additional data, if any, are needed." 34 CFR § 300.305(2); OAR 581-015-2115(1)(b). As both Student's special education teacher and case manager, Mr. Page was best suited to provide evaluative data on Student's progress. Parental input was not required during the review of existing data obtained by Mr. Brant from Mr. Page.

Thus, the ALJ erred by finding that the District violated the IDEA by not obtaining the Parents' consent to the FBA conducted by Mr. Brant. Nonetheless, as discussed above, the FBA done in late May 2011 did not cure the District's failure to conduct a reevaluation by April 2011.

### 4.    <u>Failure to Convene IEP Meeting</u>

The ALJ found that the District's failure to hold an IEP meeting in the spring of 2011 was another serious impairment to the Parents' participation. Tr. 80. He explained:

> Had the District convened an IEP meeting earlier in the spring, when the Student's behavior had begun to deteriorate significantly, the Parents could have received proper notice of the meeting and been able to participate in a meaningful way. Assessments and evaluations could have been completed on the Student with input from the Parents. The IEP team could then have properly addressed the Student's situation and taken the appropriate steps to ensure that the procedures under the IDEA were followed.

*Id.*

Refuting the District's argument based on *G.R. ex rel. v. Dallas Sch. Dist. No. 2*, 823 F Supp2d 1120 (D Or 2011), that its response was timely, the ALJ distinguished *G.R.* Tr. 80. The

simple difference, according to the ALJ, was that in *G.R.* the district eventually held an IEP meeting although four months after the first behavioral incident, whereas "the District never convened an IEP meeting" for Student.  *Id*, citing *G.R.* at 1135.

The evidence supports the ALJ's conclusion.  Sometime after May 24, 2011, the Parents requested to meet with Ms. Patterson and Mr. Page about Student's increase in outbursts. Mother Test., Tr. 128 (Aug. 15).  The meeting was originally scheduled for May 26, but was rescheduled to May 31, 2011, after Ms. Patterson became ill.  Patterson Test., Tr. 157 (Feb. 23). Although important members of the IEP team attended, including the Parents and Mr. Page, it was not an IEP meeting and reevaluation was not on the agenda.  Porterfield Test., Tr. 208 (Feb. 28).  However, the Parents approached the meeting ready to participate as if it were an IEP meeting to reevaluate Student's placement for the remainder of the school year and for fourth grade at Boones Ferry:

> [W]e were getting ready to have a meeting to talk about, again, this is clearly not working.  What are – you know what are our options here? What can we do to survive the next ten days or so?  And, you know, what is the plan for next year because that class went up to fifth grade and [Student] was only in the third grade, and I was frightened to think about spending another two years in that situation.

Mother Test., Tr. 127-28 (Aug. 15).

No additional meetings were convened with Parents to address Student's needs during the remaining seven school days of 2010-11.  *Id* at 143.  Sometime in late May or early June 2011, the Parents decided to place Student in a private school for the next school year and notified Dr. Welch by letter dated June 5, 2011.  Taylor Test., Tr. 201-02 (Aug. 14); Student Ex. 72.

The District attempted to convene an IEP meeting before Student entered fourth grade. In late July 2011, Carolyn Miller, the Assistant Director of Student Services, contacted the Mother to ask about setting up an IEP meeting and also to meet briefly for an update on the new

CRC program at Boones Ferry for students with autism.  Miller Test., Tr. 253, 258, 265 (Feb. 27); Mother Test., Tr. 154-57 (Aug. 15); District Ex. 41.  The new CRC classroom was created with an emphasis on implementing strategies that were specifically tailored to students with autism, which was not the case with the prior CRC program.  Miller Test., Tr. 260-61 (Feb. 27); *see also* Ziolko Test., Tr. 69, 72 (Feb. 23).

The Mother responded that she would contact her legal counsel and get back to Ms. Miller.  Miller Test., Tr. 253 (Feb. 27).  The Mother called Ms. Miller back and said she would prefer to meet with Ms. Miller to hear about the plans for the CRC classroom.  *Id* at 253-54.  That meeting was held on August 3, 2011.  *Id* at 254.  At the end of the meeting, the group talked about next steps, and the Parents informed Ms. Miller that they would contact her upon their return from vacation to discuss the next steps and an IEP meeting.  *Id*.  However, the Parents never contacted Ms. Miller after returning from vacation.  *Id* at 256.  Instead, they filed the Due Process Complaint.  *Id* at 256-57.

The IDEA places the responsibility for the IEP process in the hands of the state and LEAs.  20 USC §§ 1401(19), 1412(a)(11), 1413(e)(4); 34 CFR § 300.322(a).  The IEP is the "central feature" of the IDEA, not simply as a procedural step, but as the mechanism for the fundamental principle of parental participation.  The District maintains that its attempt to schedule an IEP team meeting stalled due to the Parents' lack of cooperation.  Even so, as explained below, the District significantly impaired the opportunity of the Parents to participate by making three prior changes in Student's placement during the 2010-11 year without first assembling the IEP team to discuss these changes.

///

///

B.      **Appropriate Placement**

The ALJ's final conclusion of law is that the District failed to provide the appropriate

placement for Student during the 2010-11 year.  Tr. 73.  To support this conclusion, the ALJ

found that the District had stopped sending Student to music and physical education ("PE")

classes with the partner regular education class.  Tr. 80.  Additionally, he found that the District

had changed the location of Student's one-on-one instruction with Victoria Poarch (IA in the AA

classroom) to a more secluded environment outside the classroom.  *Id*.  Because these changes

happened without the Parents' knowledge or consent, the ALJ found that their ability to provide

input on mitigating the isolating effect of the changes was seriously impaired.  Tr. 80-81.  This

conclusion is fully supported by the evidence.

At the beginning of the 2010-11 year, Student attended lunch and recess with Ms. Krieg's

regular education third grade class.  Tr. 61.  As described in the December 2010 IEP:

> [The Student] attends lunch and recess with a partner class and music with
> a fourth grade partner class due to schedule conflicts. . . . During lunch,
> [the Student] is social, usually waiting for someone to talk to him first. . . .
> [The Student] seems to enjoy going to his partner class. . . . [The
> Student's] challenges with academics, communication, and social
> cognition make it difficult for him to be successful in the general
> education classroom.

District Ex. 19, pp. 3-4.

The December 2010 IEP also established Student's placement for integrating with the

regular classroom and Mr. Page's class through December 2011.  The IEP team determined that

Student "need[ed] to be removed from participating with nondisabled students in the regular

classroom, extracurricular, or nonacademic activities for the provision of special education

services, related services, or supplementary aids and services."  *Id*, p. 11.  It considered that fact

that Student was "served in a small, self-contained special education classroom for over 60% of

the school day." *Id.* The justification for removal was that Student "require[d] a small, self-contained classroom due to his need for behavioral support and instruction at his academic level in a small group." *Id.* As a result, the IEP team placed Student in a "self-contained classroom for specially designed instruction in the areas of reading, writing, math, and social/behavioral support for three hours per day," with mainstreaming "when appropriate with non-disabled peers." *Id*, p. 12.

The Mother learned for the first time at the December 7, 2010 IEP meeting that Student had not been attending music class since September 2010.[11] Mother Test., Tr. 67-69 (Aug. 15); *see also* Page Test., Tr. 598 (Feb. 24). Since Ms. Krieg's class attended music at the same time Student was scheduled for special education services, Mr. Page tried to arrange another time for Student to attend music either with the second or fourth grade classes. Page Test., Tr. 597-98 (Feb. 24). At first Student enjoyed attending music with the fourth grade class. Mother Test., Tr. 69 (Aug. 15). Ultimately the arrangement was unsuccessful because Student was unfamiliar with the substitute teacher. Page Test., Tr. 599 (Feb. 24). The District never found another time for Student to resume music class before his behavior began deteriorating in early 2011. *Id* at 600.

Mr. Page and the Mother did discuss further changes to Student's music class placement. Page Test., Tr. 596 (Feb. 24) ("And I forget, it's in the e-mails, but I remember e-mailing back in — with Julie about — because there was also a fourth grade performance coming up, and so we were talking about do we start him now or do we wait — do we wait."). However, at that point, Mr. Page had already withdrawn Student from music class without parental input.

---

[11] The previous December 2009 IEP removed Student from the regular education environment except for "music, lunch, and recess." District Ex. 12, p. 14.

As pointed out by the ALJ, Student's June 6, 2011 report card was inaccurate by stating that Student was "developing and improving" in music with Ms. Krieg's class. Student Ex. 73, p. 2. In fact, Student had not attended music class since September 2010. In addition, he received music instruction with the fourth grade class, not Ms. Krieg's class, and was taught by a substitute, not Ms. Stevens-Johnson, as stated in the report card. *See* Page Test., Tr. 599 (Feb. 24).

Mr. Page also first informed the Mother at the December 7, 2010 IEP meeting that Student was no longer engaging with regular education students at recess. Mother Test., Tr. 69 (Aug. 15). Instead, Mr. Page was using recess as an opportunity for the AA students to socialize. *Id.*

At some point in early 2011, Mr. Page informed the Mother that he had stopped sending Student to PE class with his AA class. *Id* at 99-100. In response to the Mother's inquiry about Student's behavior in PE, Mr. Page told her, "he is not going. He hasn't been going for a while." *Id*, p. 100. Mr. Page had not previously informed the Parents of this change.

On April 26, 2011, Mr. Page emailed the Mother that he had kept Student out of the regular class for lunch the previous day because Student had raised his fists to Ms. Krieg in a threatening stance the week before. Student Ex. 48. Mr. Page suggested a "need to start having [Student] eat lunch in my class to make sure everyone is safe." *Id.* The Mother did not oppose that suggestion, although Mr. Page did not say if and when he would implement the change.

On May 24, 2011, Ms. Menne suggested to Mr. Page and Ms. Patterson a new instruction arrangement for Student through the end of the year: "For the remainder of the school year (11 ½ days), [Student] will work with staff members in an alternative space throughout his school day. . . . [Mr. Page] will work with [Student] in a separate location." Student Ex. 60. The

District never forwarded this email to the Parents. Mother Test., Tr. 136 (Aug. 15). The District hired Ms. Poarch, a certified general education teacher with experience working in a self-contained behavior classroom, to work with Student one-on-one. Student Ex. 56; Patterson Test., Tr. 155, 222-23 (Feb. 23). On May 25, 2011, Ms. Patterson emailed the Parents that Ms. Poarch would support Mr. Page by working with Student one-on-one for the remainder of the year, but did not indicate where the solo instruction would take place. District Ex. 31. The Mother was under the impression that it would be in Mr. Page's classroom. Mother Test., Tr. 131 (Aug. 15). However, Ms. Poarch worked with Student in an office adjacent to the principal's office. *Id* at 132. On May 26, 2011, when picking Student up early from school, the Mother discovered that Student had attended sessions with Ms. Poarch in a separate room all day on both May 25 and May 26, with only 10 minutes of peer interaction on May 26. *Id* at 131-33, 135.

The December 2010 IEP allowed for flexibility in integrating Student with Ms. Krieg's class by mainstreaming Student "when appropriate." District Ex. 19, p. 12. This flexibility allowed for some unilateral changes, such as keeping Student back from lunch on April 25, 2011, after he had raised his fists to Ms. Krieg. The IEP also may have allowed for some long-term changes, such as keeping Student out of lunch indefinitely which Mr. Page suggested to the Mother on April 26, 2011. But it did not contemplate changes such as separating his instruction to a space outside of the AA classroom. Thus, when the District failed to inform the Parents of Student's reduced participation in the AA classroom, it changed Student's IEP with no input from the Parents. The December 2010 IEP simply did not give District staff the authority to make such a change without the Parents' participation.

The District argues that its approach is similar to that taken by the district in *Corbett Public School District* 39, 10-054-006, 110 LRP 26483 (OSEA, Apr. 30, 2010).[12] In that case, an IEP team agreed, with consent from the student's parent, to return her to the general education class for partial school days at the beginning of fourth grade. During the first month in her new placement, the student's behavior was visibly disruptive to her learning and the classroom environment. Several personnel collected data about the student's progress for about a month until the IEP team met again. Only then did the staff share the data with the student's parent and solicit feedback. At the meeting, the parent insisted that the data was inaccurate because it did not reflect the student's recent medication changes or her feelings about being treated differently due to the additional supervision and half-day schedule. As a result, the team agreed to change the student back to a full-day schedule. The student's parent and the staff met through the remainder of the fall to review the behavior data and adjust the student's schedule and behavioral support services. In a Due Process Complaint, the parent alleged in part that the district had denied her an opportunity to participate in meetings with respect to the student's placement. The ALJ disagreed, finding that the district "took substantial steps" to honor the parent's request to keep the student in the general education classroom. *Id* at *16. The record did not reflect that the staff had "made up their mind" about the student's placement, as the parent argued. *Id.* The ALJ found no fault with the staff's action during the month of gathering data about sources of the child's explosive behavior in the general classroom. Rather, the district's efforts treated the parent as "an equal participant in these meetings, and took the parent's suggestions for improving the student's participation." *Id.*

---

[12] The District cites several more cases and final orders as support for its arguments, including *Beaverton Sch. Dist.*, 109 LRP 22366 (OSEA Mar. 20, 2000). Those decisions are not helpful because they involve disputes over the initial evaluation for disability and placement decisions that are subject to additional procedural regulations and raise different standards for parental involvement.

As is apparent from that ruling, a district can comply with the aims of parental

involvement without obtaining consent for each preparatory step leading up to a change in

placement.  However, placement changes can be made only after an IEP meeting that takes into

account the parents' suggestions.  In fact, the IDEA envisions active parental involvement in

three defining stages:

> 1.  Have the opportunity to participate in meetings with respect to
> the identification, evaluation, and educational placement of their child, and
> the provision of [a] FAPE to the child (including IEP meetings)[;]
> 2.  Be part of the groups that determine what additional data are
> needed as part of an evaluation of their child, and determine their child's
> eligibility and educational placement[;]
> 3.  Have their concerns and the information that they provide
> regarding their child considered in developing and reviewing their child's
> IEPs.

*Id* at **15-16.

The District contends that like the Corbett School District, it was tracking information as

Student's behavior worsened and waited to consult the Parents until after the data collection was

completed.  A key difference, however, is how the Corbett School District used the IEP meeting.

The Corbett School District assembled the IEP team to share the data, consider the parent's

feedback, and decide how to respond.  In contrast, the District made changes to the IEP while

still collecting data, culminating in the drastic change of separating Student from his AA

classroom without any input from the Parents.

The District did host a meeting on May 31, 2011, with the Parents, but only after Student

had already begun working with Ms. Poarch outside the AA classroom.  Although it was not an

IEP meeting, the Parents clearly stated their desire to reintegrate Student into the AA classroom

for the remainder of the 2010-11 year.  District Ex. 34.  On May 30, 2011, the Parents proposed

an alternative to Ms. Patterson.  Because the current placement was "unacceptable from [their]

perspective based on [Student]'s self esteem issues the last week," they felt "it is best for

[Student] to not attend school unless he is more integrated with other peers." *Id*.  Instead, they

recommended:

> integrating [Student] back into the classroom by working with [Ms.
> Poarch] one on one, either on the porch or in an area of the classroom
> away from [others].  He can also go to Krieg's room for lunch and recess
> with [Ms. Poarch].  If recess doesn't work with [Mr. Page]'s class, our
> suggestion is to have him go with one of the other 3rd grade classes. . . .
> Please let us know ASAP if the option above will work, and if not, what
> other alternatives are available?

*Id.*

That meeting was attended by the Parents, Mr. Page, Kathy Porterfield (an instructional

coordinator at Boones Ferry), Lindsay Rentschler (Student's private Applied Behavioral

Analysis therapist), Ms. Ziolko, and Dr. Welch.  According to Ms. Ziolko, the group decided that

for the reminder of the year, Student would "work in a room right next to the classroom with

either a teacher, an IA, one-on-one with opportunities to go into the classroom as it worked out."

Ziolko Test., Tr. 61 (Feb. 23).  Student now challenges whether the Parents agreed to that new

arrangement at the meeting.  Regardless, the Parents' email to Mr. Page expressing their

lingering concerns about the effectiveness of this interim plan demonstrates that the May 31

meeting violated the IDEA tenet of parental participation as the highest priority members of the

IEP team.  After the meeting, Parents still felt that Student was not integrated.  District Ex. 37,

p. 1 ("I've had a little time to think about this since we spoke and I have more concerns.  First, I

honestly think the anxiety he is feeling is elevated right now by being isolated every day. . . .  He

is now referring to the room as 'jail.'").

Had the District taken the same approach as the Corbett School District, the May 31,

2011 meeting would have been an IEP meeting with a properly assembled IEP team to review

the data collected by Mr. Brant and to discuss whether further assessments were necessary to comply with reevaluation procedures. Instead, the purpose of the meeting was to discuss modifications to Student's placement for the remaining seven days of school. Ziolko Test., Tr. 60 (Feb. 23); Porterfield Test., Tr. 208 (Feb. 28). Although the District's plan to form a new CRC classroom for the following school year was mentioned, the group did not discuss Student's long-term placement or reevaluation. Ziolko Test., Tr. 62-63 (Feb. 23). And even though Mr. Brant had completed the FBA on May 26, he did not attend the meeting, and his findings were not discussed. *Id* at 115.

Based on a preponderance of the evidence, the District violated the IDEA by initiating placement changes without parental input. Although the District maintains that it was merely implementing short-term solutions to accommodate Student until the end of the year, its response essentially turned the reevaluation process on its head. Thus, the ALJ properly concluded that the District violated the IDEA by failing to provide an appropriate placement for Student beginning in the spring of 2011.

## III.    **Remedy**

Both parties contest the relief awarded by the ALJ based on the District's violations of the IDEA. The ALJ ordered the District to reimburse the Parents for past private tuition at Victory Academy from September 2011 through August 2012 in the amount of $17,000.00 ($1,700.00 per month for 10 months). Tr. 83. Moreover, the ALJ noted that the "December 2010 IEP expired in December 2011," that the "District has not offered the Student an IEP that provides a FAPE," and until the District offers an IEP meeting and a FAPE, the Parents are entitled to prospective reimbursement for Victory Academy in the amount of $1,700.00 per month. Tr. 81.

The ALJ, however, rejected the Parents' demand for reimbursement for private services obtained for Student, such as tutors, from August 15, 2009, through December 2011, noting as an initial matter that the District provided a FAPE "to the Student during the 2009-2010 school year and during the 2010-2011 school year until the spring of 2011." Tr. 81-82. Furthermore, the ALJ concluded that the Parents were not entitled to these private expenses because they had not given notice of their demand for reimbursement until June 5, 2011, well after the bulk of the private services had been incurred. Tr. 82. The ALJ also denied the Parents' requested remedy of training for District staff, noting that the Parents had failed to present any evidence as to the nature and extent of such training. *Id*.

The ALJ did grant the Parents' requested remedies of an evaluation planning and IEP placement meeting, ordering that within 14 days of the Final Order (by October 18, 2012), the District convene an IEP evaluation planning meeting to determine which assessments are needed to determine Student's educational needs and then to "conduct those evaluations as soon as reasonably possible." Tr. 83. The ALJ then ordered that once the evaluations are completed, the District must "promptly convene an IEP meeting to determine an appropriate IEP and BIP that addresses all of the Student's educational needs." *Id*.

The court is authorized to "grant such relief as the court determines is appropriate." 20 USC § 1415(i)(2)(C)(iii). "Appropriate relief is relief designed to ensure that the student is appropriately educated within the meaning of the IDEA." *Parents of Student W. v. Payallup Sch. Dist., No. 3*, 31 F3d 1489, 1497 (9th Cir 1994). Accordingly, courts commonly award compensatory education which "aim[s] to place disabled children in the same position they would have occupied but for the school district's violations of the IDEA." *Reid ex rel. Reid v. Dist. of Col.*, 401 F3d 516, 518 (Fed Cir 2005); *see also Park, ex rel. Park v. Anaheim Union*

*High Sch. Dist.*, 464 F3d 1025, 1033-34 (9th Cir 2006) (awarding compensatory education in the form of training to the student's teachers because it was unclear whether additional services provided to the student would have addressed his needs).  "Courts fashioning discretionary equitable relief under IDEA must consider all relevant factors, including the appropriate and reasonable level of reimbursement that should be required."  *Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 US 7, 15-16 (1993); *Park*, 464 F3d at 1033 (courts are not required to "provide a day-for-day compensation for time missed").

### A.    Tuition Reimbursement

The District argues that the ALJ erred by awarding tuition reimbursement for Student to attend Victory Academy from September 2011 through August 2012 and continuing for the 2012-13 school year in the amount of $1,700.00 per month until the District provides Student with a FAPE.  The record is silent as to whether the District has provided Student with a FAPE as ordered by the ALJ.

Under the IDEA, "a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a [FAPE] available to the child in a timely manner prior to that enrollment."  20 USC § 1412(a)(10)(C)(ii).  Thus, reimbursement for a unilateral private school placement made by the parents may be awarded only if it is first determined that the school district's program did not amount to a FAPE.  *See Sch. Comm. of Burlington v. Dep't of Educ.* ("*Burlington*"), 471 US 359, 369-70 (1985) (construing Education of the Handicapped Act, predecessor to IDEA); *M.C. ex rel. Mrs. C. v. Voluntown Bd. of Educ.*, 226 F3d 60, 66-67 (2nd Cir 2000).  Under this standard, parents are entitled to reimbursement if a federal court concludes both that the public placement is inappropriate and that the requested private school placement is proper under the

IDEA. *Forest Grove Sch. Dist. v. T.A.*, 557 US 230, 246 (2009) (citation omitted). In order for a private placement to be appropriate under the IDEA, it must: (1) address the student's unique needs; (2) provide adequate support services so the child can take advantage of educational opportunities; and (3) satisfy the IEP. *Capistrano*, 59 F3d at 884, 895-96, citing *Rowley*, 458 US at 203.

In addition, "courts retain discretion to reduce the amount of a reimbursement award if the equities so warrant — for instance, if the parents failed to give the school district adequate notice of their intent to enroll the child in private school." *Forest Grove Sch. Dist.*, 557 US at 246-47. The IDEA requires the parents to provide notice, either at the most recent IEP meeting prior to removal or in writing 10 business days "prior to removal of the child from the public school . . . that they were rejecting the placement proposed by the public agency to provide a [FAPE] to their child, including stating their concerns and their intent to enroll their child in a private school at public expense." 20 USC § 1412(a)(10)(C)(iii)(I)(aa); *see also* OAR 581-015-2515(4)-(5). The purpose of this notice provision is to "giv[e] the school system an opportunity, before the child is removed, to assemble a team, evaluate the child, devise an appropriate plan, and determine whether a [FAPE] can be provided in the public schools." *Greenland Sch. Dist. v. Amy N.*, 358 F3d 150, 159 (1st Cir 2004), *abrogated on other grounds by Forest Grove Sch. Dist.*, 557 US 230; *see also Forest Grove Sch. Dist. v. T.A.*, 523 F3d 1078, 1089 (9th Cir 2008) *aff'd*, 557 US 230 (2009) (notice gives the district a "reasonable opportunity to complete the process of evaluating the student and making a placement recommendation").

The Parents did not give 10-days written notice to the District that they were rejecting the proposed placement in the new CRC before enrolling Student at Victory Academy and removing

him from Boones Ferry.  In fact, the Parents failed to raise the issue of reimbursement until filing the Due Process Complaint.

Constructive notice is simply not sufficient.  Even when parents have partially satisfied the notice provision, failure to comply with all of the requirements has resulted in denial of tuition reimbursement for residential placements.  *E.g.*, *Berger v. Medina City Sch. Dist.*, 348 F3d 513, 523-24 (6th Cir 2003) (denying reimbursement because parents arranged to enroll student at private school before requesting due process hearing or advising the district of their specific objections and intent to remove student); *Rafferty v. Cranston Pub. Sch. Comm.*, 315 F3d 21, 27 (1st Cir 2002) (upholding denial of tuition reimbursement where parent failed to provide school district required notice at least 10 business days prior to removing student from public school).

Moreover, the District challenges the ALJ's conclusion that the "[p]arents established that the program at Victory Academy meets the Student's educational needs for a child with autism.  The Student was and is doing well at Victory Academy and has received educational benefit."  Tr. 31.  Citing *Ashland*, 585 F Supp2d at 1227, the District contends that the ALJ failed to consider the District's progress toward the end of the 2010-2011 school year, specifically the development of the new CRC program to serve students with autism for the following school year.  During July 2011, it took the final steps to have the new CRC classroom operational.  Miller Test., Tr. 258 (Feb. 27).  Although the Parents agreed to meet with Ms. Miller to learn about the new CRC program, they did so only after stating their intent to enroll Student in Victory Academy for the 2011-12 school year.  They also rejected the District's effort to schedule an IEP meeting.

In *Ashland*, the court overturned the ALJ's award of tuition reimbursement based on defects in past IEPs. Specifically, it held that:

> The IDEA is not a tort remedy to compensate parents with money damages for past wrongs. Even assuming a 2003 or 2004 IEP was inadequate, those IEPs were superseded by the October 2005 and December 2005 IEPs. Defects in a superseded IEP do not ordinarily (if ever) justify removing the child from school several years later and requiring the District to pay for her future private schooling.

*Id*, 585 F Supp2d at 1227.

Instead, "the inquiry must focus on the child's IEP at the time she was removed from school, whether she was then receiving a [FAPE], and whether the appropriate placement is the one being proposed by the District, or the one proposed by Parents, or some other placement." *Id.*

> Allowing a parent belatedly to seek reimbursement for a private residential placement in this manner amounts to an end-run around the requirement that parents must give advance notice that "they [a]re rejecting the placement proposed by the public agency to provide a [FAPE] to their child, including stating their concerns and their intent to enroll their child in a private school at public expense.

*Id* at 1227-28 (alteration in original), quoting 20 § USC 1412(a)(10)(C)(iii)(l).

Similarly here, the Parents decided to enroll Student in Victory Academy without giving advance notice to the District and without considering the District's offer to place Student in the new CRC classroom.

In response, Student first argues that the District did not offer the new CRC as a placement option at an IEP meeting as required by *Union Sch. Dist. v. Smith*, 15 F3d 1519 (9th Cir 1994), *cert. denied*, 513 US 965 (1994). Because the only prior placement offered was the December 2010 IEP which was no longer appropriate by March 2011, Student asserts that the ALJ was excused from analyzing the new CRC program.

*Union Sch. Dist.*, however, involved significantly different facts.  In that case, the school district never attempted to schedule or convene an IEP meeting to make an offer of a certain placement because it believed that the parents were resistant to considering that program.  In contrast here, the District attempted to convene an IEP meeting with the Parents to discuss and offer the new CRC program before the start of the 2011-12 school year.  While leading the District to believe that they would participate in the IEP meeting, the Parents never responded to the District's attempt to schedule it.

Moreover, the purpose of a formal IEP meeting is to create a record of when and what placements are offered and discussed, assist parents in bringing an educational complaint regarding the placement, allow the parents to effectively consider the appropriateness of the placement, and allow the school district to present sufficient evidence of the placement to the ALJ at the due process hearing.  *Id* at 1526 & n2.  Again, in marked contrast to *Union Sch. Dist.*, the District met with the Parents to discuss the timing and nature of the new CRC program and attempted to schedule an IEP meeting but the Parents did not cooperate.  In addition, the lack of an IEP meeting did not impede the Parents' ability to bring a Due Process Complaint to challenge the adequacy of Student's placement or the District's ability to present evidence about the new CRC to the ALJ.

Thus, unlike the school district in *Union Sch. Dist.*, the District took reasonable steps to convene an IEP meeting and make a placement offer, received representations from the Parents that they would cooperate, and relied on those representations.  Under those circumstances, the District's failure to formally offer a placement at an actual IEP meeting does not violate the IDEA.  *See, e.g., M.R. v. S. Orangetown Cent. Sch. Dist.*, 2011 WL 6307563, at **2-3, 11 (SDNY Dec 16, 2011) (distinguishing *Union* where school district had discussed, but not been

able to formally offer specific placement during IEP meeting due to parents' delaying the

process); *N.R. ex rel. B.R. v. San Ramon Valley Unified Sch. Dist.*, 2007 WL 216323, at *12

(ND Cal Jan 25, 2007) (distinguishing *Union* where school district had previously shared

information with parents regarding transition placement plan and attempted to schedule IEP

meetings but were thwarted due to "parents' conscious decision to stop cooperating with the

District").  Similarly here, the District should not be held accountable for the Parents' lack of

cooperation.

Furthermore, a court must consider the equities, including the conduct of both parties, in

deciding whether a grant of tuition reimbursement is appropriate.  *Parents of Student W. v.*

*Puyallup Sch. Dist., No. 3*, 31 F3d 1489, 1496 (9th Cir 1994).  For example, in *MM v. Sch. Dist.*,

303 F3d 523 (4th Cir 2002), the Fourth Circuit denied the parents' claim for reimbursement of

MM's private tuition costs, noting that "the District was willing to offer MM a FAPE, and that it

had attempted to do so," and that "her parents had a full opportunity to participate in the

development of the Proposed 1996-97 IEP."  *Id* at 534.  Additionally, there was no evidence

presented that MM suffered any educational loss because her parents "would [not] have accepted

any FAPE offered by the District that did not include reimbursement for the [in-home autism]

program," and "MM suffered no prejudice from the District's failure to agree to her parents'

demands."  *Id* at 535.  As a result, the court concluded that "it would be improper to hold [the]

School District liable for the procedural violation of failing to have the IEP completed and

signed, when that failure was the result of [the parents'] lack of cooperation."  *Id* at 535

(alterations in original).  *See also C.H. v. Cape Henlopen Sch. Dist.*, 606 F3d 59, 69 (3rd Cir

2010) (denying tuition reimbursement where parents delayed completion of IEP meeting

terminated process by filing a due process request).  Here the Parents were not even willing to

consider enrollment in the CRC program because they decided shortly after the May 25, 2011

meeting that they would enroll Student at Victory Academy.  Aglipay Test., Tr. 201-02

(Aug. 14).

Student further asserts that even if the Parents had cooperated and participated in an IEP

meeting in the summer of 2011, that meeting would have been too late.  However, the IDEA

only requires an IEP "[a]t the beginning of each school year."  20 USC § 1414(d)(2)(A).  No

statute or regulation requires "that an IEP be produced at the time parents demand.  Instead,

school districts must only ensure that a child's IEP is in effect by the beginning of the school

year and that parents are provided a copy."  *Cerra v. Pawling Cent. Sch. Dist.*, 427 F3d 186, 194

(2nd Cir 2005).  A school district fulfills this obligation by completing the IEP and providing the

parents a copy before the first day of school.  *Id.*  Thus, an IEP meeting with the Parents in the

summer of 2011 prior to the beginning of the 2011-12 school year would not have been too late.

Student next argues that, even if offered by the District at an IEP meeting, the new CRC

placement would have been inappropriate.  In contrast, Student contends that, as held by the

ALJ, his placement at Victory Academy was appropriate because it provided educational

instruction specially designed to meet his unique needs, as well as the supports necessary for him

to benefit from instruction.  The preponderance of the evidence does not support that conclusion.

Contrary to Student's assertion, the new CRC classroom was not "the same as" the CRC

in which he had been placed years earlier.  Ms. Miller testified that the new CRC classroom was

created with an emphasis on implementing strategies that were specifically tailored towards

students with autism, which was not the case with the prior CRC program.  Miller Test., Tr. 260-

61 (Feb. 27); *see also* Ziolko Test., Tr. 69, 72 (Feb. 23).  She also testified that Priscilla Kelly,

who was hired to teach the CRC 3-5 classroom for the 2011-12 school year, had training and

background in working with students with autism from a program at Portland State University and that she came highly recommended for the CRC program.  Miller Test., Tr. 265-66 (Feb. 27).  Mikhailah Brace, who took over the position in Fall 2012, had been the Autism Specialist for another school district.  *Id* at 267.  Ms. Ziolko, the District's Autism Specialist, oversaw the transition, working with Ms. Brace every day for two months.  *Id* at 268-71.  Ms. Brace also had previous teaching experience with autistic students for over six years and had conducted autism trainings with the general teaching staff in her prior district.  *Id* at 267.  Neither Ms. Kelly nor Ms. Brace taught in the CRC program that Student previously attended.  Ms. Miller's testimony is confirmed by her contemporaneous written notes.  *Id* at 252-54; District Ex. 41.

Student claims that the new CRC 3-5 program only used one curriculum, Superflex, which addresses social thinking and is not sufficient to address "in the moment" situations. However, Student's attempts to micromanage issues such as staffing, methodologies, and curriculum is not permitted by the IDEA.  *See, e.g.*, *Lachman*, 852 F2d at 297.  Furthermore, Student never attended, and none of his witnesses had observed or acquired firsthand knowledge of, the new CRC program.

Student also argues that the new CRC program would not be an appropriate placement because V and L, other students with whom he did not get along, would have been in that classroom as well.  However, these students had previously been in the AA classroom with Student, and until the spring of 2011, Student was making educational and behavioral progress regardless of their presence.  Further, V and L had made significant progress in their own behaviors during that time period.  Ziolko Test., Tr. 26-27 (Aug. 16).  In the new CRC program, staff planned to minimize the amount of contact with V and L and introduce the students to one another in a controlled setting where they could learn to interact appropriately and to develop

strategies to cope with each other's idiosyncrasies.  *Id* at 27-28.  Ms. Ziolko testified that simply

separating students from one another was neither educationally prudent nor practical, given that

another annoying student or person will always be in Student's life.  *Id* at 28-30.  The more

educationally appropriate approach is to teach students replacement strategies and coping skills.

*Id.*

This approach was reinforced by Student's witness, Kristina Montgomery, the behavior

specialist who worked with Student before and after he enrolled at Victory Academy and who

explained the benefits to the family of moving Student to group, as opposed to individual,

sessions with her to create a teachable moment to work on developing social skills.  Montgomery

Test., Tr. 51-52 (Mar. 15).  Even at Victory Academy, Student encountered "bullies."  Miller

Test., Tr. 34 (Aug. 14).  Although Student asserts that progress had been made in his

relationships with peers, he cites no supporting evidence.  In any event, any such progress

undermines his argument that the presence of V and L would render the new CRC program

inappropriate.

The ALJ's analysis of Victory Academy was an appropriate alternative placement lacked

substance.  As pointed out by the District, the record reveals that Victory Academy is subject to

many of the same criticisms leveled by the Parents against the District.  The staff at Victory

Academy did not necessarily obtain data or numerical evidence of any progress towards

Student's goals.  Forgeron Test., Tr. 73-78 (Mar. 14) (use of subjective, rather than numerical

measures of performance);  *id* at 90-91 (Student's scores went down in some categories);

Montgomery Test., Tr. 22-23, 29, 33-34 (Mar. 15) (no data tracking sheets, only subjective

opinions and anecdotal observations); *id* at Tr. 27-41, 43-44 (no progress notes, just a standard

report card and verbal communications); Dahm Test., Tr. 190-91 (Mar. 15); Aglipay Test., 316-

17, 319-22, 337, 339-41, 343-47 (Mar. 15) (no progress information or numerical data, just

observation).  Victory Academy tried a number of strategies, such as developing a Behavior

Support Plan and trying a more supportive classroom placement, before removing Student in the

spring of 2012.  Those strategies mirror the steps taken by the District a year earlier by first

attempting additional strategies and interventions, gathering data and developing an FBA and

related safety and trust plans, and finally hiring additional staff  to enable more direct instruction

for Student.  Even if Student's behavior in the spring of 2012 became more aggressive due to a

medical procedure, as found by the ALJ (Tr. 72), Victory Academy's response of indefinitely

removing him pending a medical examination was more drastic than the District's response

when faced with a similar increase in aggressive behaviors.  The District did not remove Student

completely, but tried to maintain him in a school setting in order to continue his education.

Furthermore, by the closing of the record in this case, Student still had not been allowed to begin

attending full days at Victory Academy.  Aglipay Test., Tr. 42-44 (Aug. 14).  Therefore, there is

an incomplete record of "improved" behavior based on only partial attendance.

 Accordingly, based on the evidence and equities, this court finds that the District's

violations of the IDEA for the 2010-11 school year do not justify requiring the District to

reimburse the Parents for Student's tuition at Victory Academy.

 **B.**  **Reimbursement for Private Services**

 From June 2009 through December 2011, the Parents hired and paid private tutors to

supplement Student's education by both the District and Victory Academy in the sum of

$19,537.72.  Tr. 73.  The ALJ concluded that "[p]rior to June 5, 2011, the District was not on

notice of the Parent's position with respect to the education the Student was receiving from the

District," such that "it would be inappropriate for the Parents to receive reimbursement for

supplemental educational services they provided to the Student since August 15, 2009." Tr. 82. Student challenges this reasoning because the District was aware at all times that the Parents were paying for private providers to address his needs due to the District's failure to do so, rendering formal written notice unnecessary.

The District contends that the Parents' failure to give the 10-day notice required by 20 USC § 1412(a)(10)(C)(iii) is dispositive. That provision applies to reimbursement for "the cost of education, including special education and related services, of a child with a disability at a private school or facility," but only after a parent unilaterally removes a student from public school. By not giving that notice, the Parents are not entitled to reimbursement for educational costs incurred after they unilaterally removed Student from Boones Ferry on June 5, 2011.

This court can find no authority to extend the 10-day notice requirement to supplemental services provided by parents while their child is still enrolled in public school. However, as held by the ALJ, the District did not fail to provide a FAPE to Student until the spring of 2011. Thus, Student has no basis under the IDEA for obtaining reimbursement for supplemental services prior to the spring of 2011.

That leaves at issue only the supplemental services provided by the Parents for a few months during the spring of 2011 prior to enrollment of Student at Victory Academy. A judge has discretion to fashion whatever remedy the judge deems appropriate as compensatory education to address the needs of the student who has been denied a FAPE. *Park*, 464 F3d at 1033-34. However, a court may consider all relevant factors, including the conduct by the parties. This court agrees with the ALJ that reimbursement for the private services the Parents provided is not necessary, even if it served to mitigate the damage done by District's denial of a FAPE during that period of time.

C.    **Additional Staff Training**

Student also contends that the ALJ improperly denied the request for staff training based on the District staff's repeated failures to fulfill the procedural and substantive requirements of the IDEA.  Regardless of their prior training or qualifications, Student asserts that the District's staff lacked a sufficient understanding of IDEA requirements related to IEP development, the FBA process, and the required procedures for determining and changing a student's placement to provide Student a FAPE.

As discussed above, a remedy under the IDEA is appropriate only if a violation deprived Student of an actual educational opportunity or seriously infringed on the Parents' opportunity to participate in the formulation of the IEP.  *Target Range*, 960 F2d at 1484.  Student has not established that the ALJ erred in concluding that he made progress and received a FAPE up until the spring of 2011.  The mere fact that violations of the IDEA occurred during the spring of 2011 that seriously infringed on the Parents' opportunity to participate in the formulation of the IEP is insufficient to support a need for additional staff training.  It is undisputed that all of the District staff who worked with Student possessed all licensure, credentials, and training required by law and certainly more than the staff at Victory Academy.  Student failed to present any contrary evidence regarding a lack of sufficient understanding of IDEA requirements by the District's staff that requires correction.

**ORDER**

For the reasons stated above, the Final Order DP 11-122 is REVERSED as to the District's obligation for tuition reimbursement and otherwise AFFIRMED.  If the District has not done so already, it must:  (1) convene an IEP evaluation planning meeting to determine which assessments are needed to accurately determine Student's educational needs, and conduct those

evaluations as soon as reasonably possible; (2) once the evaluations are completed, promptly

convene an IEP meeting to develop an appropriate IEP and BIP that addresses all Student's

educational needs; and (3) then promptly convene a placement meeting to determine an

appropriate placement for Student.

DATED July 30, 2014.

s/ Janice M. Stewart
Janice M. Stewart
United States Magistrate Judge